Marsha BRIGGS, Mary Stubbe, Jean Degurse, Judith Aubey, Sandra L. Baines, Linda M. Brose, Carolyn R. Christian, Geraldine Grothe-Lovett, Garmen Guajardo, Barbara Hanson-Standridge, Frances Honeggar, Marilyn N. Mussallem, Barbara B. Tweedale, A. Anita Anderson, Jean K. Hermanson, Sherry Lee Kennedy, Elinor C. Pinkert, Pauline Smith, Plaintiffs,

v.

The CITY OF MADISON, Defendant.

No. 78-C-394.

United States District Court,
W. D. Wisconsin.

March 30, 1982.

As Amended April 1 and May 7, 1982.

Lee Cullen, Madison, Wis., Anne E. Simon, New York City, for plaintiffs.

Eunice Gibson, Asst. City Atty., Madison, Wis., for defendant.

CRABB, Chief Judge.

This is a civil action for declaratory, injunctive and monetary relief, brought against defendant City of Madison pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Fourteenth Amendment of the United States Constitution.[1] Plaintiffs are women employed as public health nurses by the City of Madison Department of Public Health. They allege that defendant discriminates against them on the basis of sex with respect to job compensation, job classification, and the terms, conditions and privileges of their employment by employing them as public health nurses at a lower paying classification than that of male public health sanitarians who perform jobs requiring the same or a lesser degree of qualifications, skill, effort, and responsibility under similar working conditions.

Plaintiffs are attacking what they perceive to be a history of discriminatory treatment of an entire category of female employees of the City of Madison. The discrimination is alleged to lie not in the denial of access to jobs or to promotional opportunities, and not in the denial of equal pay for equal work, but in the undervaluation of plaintiffs' work solely because of the sex of the persons performing it. Plaintiffs contend that much of the significant pay disparity that exists between males and females in the work force and, in this case, the specific pay disparity existing between sanitarians and public health nurses, can be traced to a traditional and long-accepted devaluation of the worth of jobs done primarily by women.

Plaintiffs' claims were litigated in a five-day court trial. At the close of plaintiffs' case, defendant moved to dismiss each of plaintiffs' claims, subject to the subsequent testimony of plaintiffs' expert witness. The motion was taken under advisement, and was fully briefed by the parties after the trial. The motion to dismiss, and plaintiffs' requests for relief, are now before the court.

From the evidence adduced at trial, I make the following findings of fact.

## FACTS

Plaintiffs, Marsha Briggs and seventeen other individuals, are women employed by the City of Madison Department of Public Health as public health nurses. In order to

---

1. Originally, the complaint named four city officials as additional defendants. These defendants were dismissed from the lawsuit during the course of the trial.

qualify for employment as a City of Madison public health nurse, an individual must be a registered nurse, must be certified or eligible for certification as a public health nurse as a consequence of complying with certain educational qualifications, and must be one of the following: a graduate of an accredited college or university with a bachelor of science degree program in general nursing that prepares students for beginning positions in public health nursing; or a graduate of an accredited college or university with a bachelor of science degree in public health nursing; or a graduate of a basic degree program in nursing that prepares students for a beginning position in public health nursing. Additionally, an individual must have a valid Wisconsin drivers license and a good driving record.

City of Madison public health nurses have a variety of duties and responsibilities. Public health nurses provide nursing services in public schools, private homes, satellite offices, and in emergency health situations; operate health clinics, including special immunization clinics; disseminate health education information and conduct health education programs; serve on various public health department and community health program committees; draft public health department policies and procedures; and enforce various city and state health rules. On occasion, public health nurses refer health questions or problems to sanitarians.

From 1958 to 1978, the time of the filing of this action, all the City of Madison public health nurses have been women, with the exception of one male public health nurse in the early 1970's.

In addition to public health nurses, and other classifications of workers, the City of Madison Department of Public Health employs a classification of workers called sanitarians. In order to qualify for employment at a City of Madison sanitarian, at the Level II position, an individual must be a graduate of an accredited college or university with a bachelor of science degree in environmental health, environmental science, public health, sanitary science, bacteriology, dairy industry or sanitary engineering. Additionally, an individual must have a valid Wisconsin drivers license. A sanitarian is not required to be state registered or eligible for state registration.

City of Madison sanitarians have a variety of duties and responsibilities. Sanitarians inspect eating and drinking establishments, retail food stores, hotels and motels, and pools and beaches for compliance with applicable health rules and regulations; inspect schools for compliance with applicable safety rules and regulations; review plans for private sewage systems, and respond to complaints concerning sewage systems; assist in utility shutoff procedures; investigate reports of food-borne illness and environmental complaints; coordinate the disposal of hazardous waste; provide services at health clinics, including special immunization clinics, and in emergency health situations; conduct health education programs; draft public health department and city policies and procedures; and enforce various city and state health rules. On occasion, sanitarians refer health questions or problems to public health nurses.

From 1958 to 1978, the time of the filing of this action, all the City of Madison sanitarians have been men.

From 1958 to present, the City of Madison has paid sanitarians a higher salary than the salary paid to public health nurses. The salaries were paid, and are paid, pursuant to salary schedules periodically promulgated by the City as ordinances. See Table A, incorporated herein by reference, setting forth some of these salary schedules.

Between 1958 and 1970, upward changes in the classification of sanitarians were made in 1961, 1964, 1965, and 1966; upward changes in the classification of nurses were made only twice, in 1964 and 1968.

In 1961, the reclassification of sanitarians came at the request of the Public Health Department director, Charles Kincaid. Kincaid noted in his written request that a sanitarian vacancy had existed for eight months, that several people had applied, but only one had been able to pass the examination administered by the city's Personnel

Division, and that the one applicant had been hired as a replacement for another sanitarian who had resigned.

The 1964 classification changes for sanitarians and public health nurses reflect recommendations made following a 1963 job classification survey conducted by the firm of Griffenhagen-Kroeger. Griffenhagen-Kroeger recommended that the two levels of public health nurses be merged into one level and placed at pay range 17. Additionally, the firm recommended that the two levels of sanitarian be maintained and placed at pay ranges of 16 and 19. The Level I sanitarian position was intended to be a trainee position, not requiring a college degree. The Griffenhagen-Kroeger recommendations were adopted by the City of Madison Common Council. Notwithstanding the defendant City's adoption of the recommendation and its maintenance of the sanitarian I level classification, no sanitarians have been employed at the sanitarian I level since 1961. Throughout this opinion, references to "Sanitarians" are to Level II sanitarians.

In 1965 and again in 1966, the sanitarian II classification was reclassified to a higher pay range. The 1965 increase came at the urging of the supervising sanitarian shortly after the State of Wisconsin sanitarians had received a salary increase giving them substantially higher salaries than the City of Madison sanitarians. Even after the 1966 reclassification, city sanitarians' salaries remained slightly lower than state sanitarians'.

In 1968, the City of Madison revised and partially renumbered the job classification system. The public health nurse classification was reclassified to a higher pay range; the sanitarian II classification remained in the pay range established in the previous year. Prior to the revision, Kincaid had proposed a return to three different levels of public health nurses to pay ranges 17, 18, and 19, with the sanitarian I pay range kept at 17, sanitarian II reclassified to pay range 21 and a sanitarian III level added to be compensated at pay range 22. His proposal was not adopted.

Between 1965 and 1979, defendant gave public health nurses salary increases amounting to 141% of their 1965 salary. For the years 1973–1979, the salary increases amounted to 47%. During the same period, defendant gave sanitarians salary increases of 144%; 45% of the increases came during the period 1973–1979. In 1965 the pay differential between the two groups was $59; since then sanitarians have widened the gap by an average yearly increase of $7.07 in their monthly salaries.

In 1965, the year in which the Griffenhagen-Kroeger salary recommendations were effectuated, the public health nurses' salaries were approximately 90% of the sanitarians' salaries. Since then, the nurses' salaries have averaged 85.64% of the sanitarians' salaries.

In 1965, Madison public health nurses ranked fourth in the state in salary levels, with a difference between the fourth and first ranks of $26 per month. The salaries of Madison sanitarians ranked third in the state with an $84 per month difference between third and first. In 1970, Madison public health nurse salaries ranked fourth in the state, with a difference between the fourth and first ranks of $86 per month. Madison sanitarian salaries ranked second in the state, at $15 per month less than the first-ranked sanitarians. In 1975, Madison public health nurse salaries ranked sixth in earning in the state, $99 per month less than the highest salaried nurses. Madison sanitarian salaries ranked sixth in the state as well, at $178 less than the highest salary. Table B sets forth the salaries of public health nurses and sanitarians employed by various Wisconsin cities during the years 1965–1979.

Since 1970, sanitarians have continued to receive higher pay than public health nurses. The yearly salaries and salary increases for both groups during the years 1964 to 1979 are set forth below.

COMPARISON OF SALARIES AND SALARY INCREASES

| Year | Difference in Salary | Nurses' Raise | Sanitarians' Raise | | Difference in Raise |
|------|---------------------|---------------|--------------------|---|---------------------|
| 1965 | $59 | | | | |
| 1966 | 93 | $20 | $54 | = | $34 |
| 1967 | 128 | 26 | 61 | = | 35 |

| Year | Difference in Salary | Nurse's Raise | Sanitarians' Raise | | Difference in Raise |
|------|------|------|------|---|------|
| 1968 | 136 | 28 | 36 | = | 8 |
| 1969 | 106 | 78 | 48 | = | -30 |
| 1970 | 106 | 65 | 65 | = | 0 |
| 1971 | 114 | 59 | 67 | = | 8 |
| 1972 | 120 | 47 | 53 | = | 6 |
| 1973 | 119 | 47 | 46 | = | -1 |
| 1974 | 126 | 57 | 64 | = | 7 |
| 1975 | 137 | 79 | 90 | = | 11 |
| 1976 | 142 | 64 | 69 | = | 5 |
| 1977 | 145 | 67 | 70 | = | 3 |
| 1978 | 146 | 86 | 87 | = | 1 |
| 1979 | 158 | 91 | 103 | = | 12 |

In 1970, the sanitarians became affiliated with Local 60, Wisconsin Council of County and Municipal employees (AFSCME). Also in 1970 the City set up what are now known as "compensation groups," keyed to employee bargaining units. For example, "compensation group 11" consists of all of those jobs classifications within the Police Department that are formally recognized as comprising the bargaining unit represented by the Madison Professional Police Officers Association; "compensation group 13" consists of the firefighter positions represented by Firefighter Local 311. Because the different bargaining units do not always settle for the same wage increases, the pay ranges within each compensation group do not generally correspond to the pay ranges within another compensation group.

The sanitarians are now part of compensation group 16 which includes all job classifications represented by AFSCME, Local 60.

In September, 1976, plaintiffs became affiliated with Madison Public Health Nurses' Organization, the local unit of the Wisconsin Nurses Association. The nurses have their own classification group, 22. In 1977, the union and defendant city engaged in collective bargaining negotiations. During those negotiations, a union representative requested that public health nurses be classified in a pay range equal to or greater than the pay range of sanitarians. The union's requests were denied.

In April, 1977, each plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that defendants were discriminating against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended. Specifically, each plaintiff alleged that her salary as a public health nurse was less than the salary of a sanitarian, and that her job qualifications and responsibilities were the same as or greater than the job qualifications and responsibilities of sanitarians. On May 19, 1978, the EEOC issued a right-to-sue letter to each plaintiff. On August 18, 1978, plaintiffs commenced this action in this federal district court.

On March 24, 1972, Title VII of the Civil Rights Act of 1964 became applicable to public employers. Since that time defendant has made no effort to eliminate sex-based stereotypes from the salary levels or to bring the salaries of the public health nurses up to the salary level of the sanitarians. Defendant has not conducted an objective job survey since 1963.

From 1969 through 1979, Madison public health nurses were paid less than public health nurses employed by the surrounding county. Clara Gerber, a former nursing supervisor, testified that during her tenure, from 1966 until 1975, there were vacancies each year in public health nurse positions that were not filled promptly, and in some cases, not for "a few months." In 1967, the Director of Nursing had expressed concern about nurses' salaries and spoke to Kincaid about the problem on several occasions.

Throughout the 1960's, Dr. Kincaid believed it necessary to raise pay levels for sanitarians in order to retain the sanitarians on his staff and to be able to recruit new ones, because persons qualified as sanitarians were in short supply and it was difficult to recruit trained persons for the job. Also, during this time, Kincaid thought that society expected men to be the breadwinners and protectors.

At trial, George Hagglund was qualified as an expert in the area of job evaluation. He testified on behalf of plaintiffs that from the study he had undertaken of the two positions of public health nurse and sanitarian, it was his opinion that "the classification of public health nurse is equal to

or exceeds the relative worth when the two positions are compared on the factors of skill, responsibility, effort and conditions."

From the evidence adduced by plaintiffs in their case-in-chief, a reasonable factfinder could have found that plaintiffs had made the factual showing set forth as follows:

### Plaintiffs' Factual Showing

Plaintiffs hold positions as public health nurses that have been held exclusively by women since 1958, with one brief exception. From 1958 up through the time of trial, public health nurses have received salaries lower than those paid to the sanitarians who work in the same department for the same employer as do the nurses. From 1958 to 1979, all of the sanitarians have been male.[2]

In terms of pre-hiring requirements, the position of public health nurse has slightly more stringent requirements than the position of sanitarian. Both jobs require a college degree; however, public health nurses must have had specialized training for their positions, whereas sanitarians are recruited from among graduates of a variety of educational programs. Public health nurses must be certified by the State of Wisconsin prior to hiring; sanitarians are not required to have state certification prior to hiring.

In both jobs, the employee must learn a large number of assessment techniques and use a variety of equipment and health assessment aids. In both jobs, the employee is exposed to a wide variety of work assignments.

Public health nurses do some teaching of health in the city's schools. They also do health education for individuals, particularly those who need help in managing a serious or chronic illness or in caring for an infant or handicapped child.

Both sanitarians and public health nurses must exercise tact to persuade persons to initiate corrective action in health-related fields. However, the sanitarian has the backup of license suspension or prosecution by the district or city attorney, whereas the public health nurse has legal backup only with respect to excluding persons with communicable diseases from school or employment. The risk of losing a permit or an operating license provides a strong incentive to comply with a sanitarian's suggestions for corrective action. Except for the sanction of exclusion from work or school, the public health nurse has no comparable authority and must rely more heavily on her own powers of persuasion.

In general, sanitarians deal routinely with persons they know, such as the operators of the bars, restaurants, and motels or managers of apartment houses situated in the sanitarians' area of responsibility. By contrast, much of the public health nurse's work is with persons they have never seen before, a fair number of whom have difficulty communicating because of language, cultural, mental, or emotional impediments. Public health nurses must exercise diplomacy in their relationships with the principals of the schools to which they are assigned, as it is common for principals to press nurses for diagnoses of particular symptoms, although the nurses are prohibited from making such diagnoses.

Public health nurses meet frequently with other professionals assigned to the city's schools to discuss the needs of particular children whose health problems may affect (or reflect) their emotions, mental ability, and school progress. Frequently, public health nurses will refer a person whom they have seen for health reasons to a city, county, or state agency for assistance and will monitor the referral to insure that contact is made and the necessary assistance is provided.

Both sanitarians and public health nurses have responsibility for the prevention of the kind of errors that could have serious health consequences for individuals or groups of individuals.

Both sanitarians and public health nurses supervise interns. In addition, public health nurses regularly supervise nursing

2. A female sanitarian was hired in 1979.

aides in the schools who are city employees; sanitarians have no such supervisory responsibility over any other city employee.

Both sanitarians and public health nurses are responsible for the assembling and maintenance of confidential records.

In terms of effort, both sanitarians and public health nurses work regular daytime hours, with little overtime required. Both jobs require the writing of reports and the carrying out of assessment procedures. Both jobs involve driving around the city of Madison, walking and standing on the work site, and some infrequent carrying of equipment and of supplies.

The employees in both jobs are exposed to health hazards, either from exposure to carriers of communicable diseases or from the handling of contaminated food, trash, or offal. They are subject to fairly similar working conditions in that they regularly travel from one work site to another and spend part of each day in performing office duties. However, sanitarians spend more time outside than do the nurses and as a consequence are exposed more frequently to inclement weather.

From the showing made by plaintiffs, a reasonable factfinder could have found that plaintiffs had demonstrated they occupied a sex-segregated job classification that was compensated with lower wages than those paid to the occupants of the all-male classification of sanitarian, that the jobs held by plaintiffs required skill, effort, and responsibility at least equal to, and possibly in excess of, that required of sanitarians by their jobs, and that the jobs were performed under similar working conditions.

## OPINION

Plaintiffs contend that they have been discriminated against by the defendant because of their sex; specifically, they assert that they are performing work substantially similar [3] in skill, effort, and responsibility to that performed by the male sanitarians but for which they are paid less. Plaintiffs do not confine their claim to the comparability of the functions of public health nurses and sanitarians; they contend as well that the defendant deliberately classifies and compensates the jobs differently because of the sex of the persons occupying the positions.

Having summarized plaintiffs' argument, it seems advisable to emphasize what is *not* at issue in this case. Plaintiffs are not raising a claim under the Equal Pay Act, 29 U.S.C. § 206(d); they do not contend that public health nurses and sanitarians are performing the same or equal work. Additionally, plaintiffs are not raising a claim of denial of equal access to jobs or promotional opportunities under Title VII. They do not contend that public health nurses are denied the opportunity to compete for sanitarian positions. Rather, plaintiffs' claims rest on a theory that seeks to correlate wage differentials with wage discrimination, where the wage differential applies to sex-segregated jobs of comparable content. In the discussion that follows, I will consider plaintiffs' theory as it relates to the claims raised under Title VII, Section 1983, and the Fourteenth Amendment.

### Title VII

Title VII makes it an unlawful employment practice "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex . . . ," or "to . . . classify his employees in any way which would . . . adversely affect [their] status as [employees], because of [their] sex. . . . " 42 U.S.C. § 2000e–2. If an employer engages in an unlawful employment practice, a federal district court "may enjoin the [employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate. . . . " 42 U.S.C. § 2000e–5(g).

---

**3.** In their post-trial briefs, plaintiffs occasionally characterize the different classification as involving work *equal* in skill, effort, and responsibility. Because plaintiffs do not use the word equal as it is used with respect to the Equal Pay Act, and to avoid confusion that might be caused by the use of the word "equal," this opinion adopts plaintiffs' use of the word "similar" in discussing job skill, effort, and responsibility.

As in any employment discrimination suit brought pursuant to Title VII, plaintiffs must show that they have been subjected to differential treatment by their employer for an illegal reason; in this instance, their sex.[4]

■ In this instance, plaintiffs assert that the initial showing of discrimination can be made in one of two ways: either by adducing evidence that (1) they are members of a protected class (2) who occupy a sex-segregated job classification (3) that is paid less than (4) a sex-segregated job classification occupied by men, *or* by adducing the same evidence in (1) through (4), plus evidence showing that (5) the two job classifications involve work that is similar in skill, effort, and responsibility. It is plaintiffs' assertion that either of these showings creates a prima facie case; that is, a presumption that defendant discriminated against them which, if not rebutted by defendant, will be the basis for a finding that defendant has violated the Civil Rights Act of 1964. Defendant disputes this assertion; it concedes, however, that under Title VII plaintiffs are not restricted to challenging sex discrimination in compensation only in instances involving work that meets the equal work standard of the Equal Pay Act. *See County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Boyd v. Madison County Mutual Insurance Co.*, 653 F.2d 1173 (7th Cir. 1981), *cert. denied* —— U.S. ——, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982); *IUE v. Westinghouse Electric Corp.*, 531 F.2d 1094 (3d Cir. 1980), *cert. denied* 452 U.S. 967, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978).

Examination of plaintiffs' assertion requires analysis of the purpose and function of a prima facie case in employment discrimination litigation. Essentially, the prima facie case is a means of ordering proof

that reflects both a judicial evaluation of the probabilities of the situation and the expectation that the defendant employer has superior access to the proof that will either rebut or support plaintiff's prima facie case. *Teamsters v. United States*, 431 U.S. 324, 359, n. 45, 97 S.Ct. 1843, 1866 n. 45, 52 L.Ed.2d 396 (1977), citing McCormick, *Law of Evidence* §§ 337, 343 (2d Ed. 1972).

The use of the prima facie case for employment discrimination lawsuits began in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), with articulation of a model for ordering and presenting proof in a private discrimination case. The Supreme Court explained that a plaintiff could make the necessary preliminary showing of discrimination by establishing

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. The Court noted that the standard for a prima facie case is not inflexible and the prima facie proof may vary depending on the factual situation. *Id.*, n. 13.[5]

■ Under the *McDonnell Douglas* formulation, if the plaintiff makes the preliminary showing of discrimination, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employer's rejection." *Id.* If the employer advances such a reason, the plaintiff then has an opportunity to show that the reason stated by the employer is in fact pretextual. The value of this model lies in the fact that it is "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *Furnco*

---

4. The parties agree that plaintiffs are alleging a theory of discriminatory treatment rather than discriminatory impact.

5. A prima facie case of sexual discrimination has been based on this same model. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

> A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible facts. *See Teamsters v. United States,* [431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396], at 358 n.44 [97 S.Ct. at 1866 n.44]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

*Id.*

██ I have found that a reasonable factfinder could have found at the close of plaintiffs' case-in-chief that plaintiffs had proved each element of what they contend makes out a prima facie case; that is, they have proved that 1) they are members of a protected class; 2) that they occupy a sex-segregated classification; 3) that they are paid less than 4) a sex-segregated classification occupied by men; and also 5) that the two sex-segregated classifications involve work that is similar in skill, effort, and responsibility.

The critical question is whether a reasonable factfinder could infer from a showing of the first four elements, or from all five, that it is more probable than not that the defendant engaged in an employment practice made unlawful by Title VII.

With respect to plaintiffs' first, four-part formulation, I conclude that the inference cannot be drawn and therefore, that no prima facie case is made out. The four-part formulation does not eliminate the most common, nondiscriminatory reason for wage disparity: differences in the jobs' requirements of skill, effort, and responsibility.

I am aware that there is a body of opinion that holds that there is a demonstrable correlation between sex- (or race-) segregated jobs and lower wages. This opinion is articulated by many, most forcefully by Ruth Blumrosen. Blumrosen has posited the thesis that no more is necessary to a prima facie case of legally impermissible wage discrimination than a showing of past or present job segregation by race or sex. *See* Blumrosen, *Wage Discrimination, Job Segregation and Title VII of the Civil Rights Act of 1964,* 12 U.Mich.J.L.Ref. 397 (1979).

The elements of Blumrosen's theory can be summarized as follows: job segregation and wage discrimination are intimately related; whenever there is job segregation, the same forces that determine that certain jobs will be reserved for women or minorities determine that the economic value of such jobs is low; studies undertaken in the fields of history, anthropology, economics, and sociology demonstrate that the valuation of segregated jobs has been influenced by the fact that these jobs are held by disfavored groups; therefore in a lawsuit, minorities or women who can demonstrate that they occupy traditionally segregated jobs will have made a prima facie showing that the wage rates for those jobs are discriminatorily depressed, so that the burden is on the defendant employer to demonstrate or articulate the reasons why the rate is not influenced by discriminatory factors.

I find unpersuasive the basic premise that Blumrosen or any one possesses the intellectual tools and data base that would enable them to identify the extent to which the factor of discrimination has contributed to, or created, sex-segregated jobs, and to separate that factor from the myriad of nondiscriminatory factors that may have contributed to the same result.[6] Equally unper-

6. Among others, these contributory factors would include familial and peer expectations,

suasive is the contention that a direct correlation can be shown to exist between the lower pay scales for jobs characterized as "women's work" and the fact that the jobs are so characterized. Although I share the belief that there is probably some correlation, I do not share Blumrosen's conviction that the job characterization factor is the only determinative of pay scales. In making this assertion, Blumrosen ignores other potentially determinative factors, such as "crowding" (a heavy concentration of women available for the same job), the willingness or unwillingness of women to organize for higher wages and increased benefits, and the historical reality that many of the jobs characterized by Blumrosen and others as "women's work" are jobs that have never been well-compensated, whether they have been filled by women or by men.[7]

■ For purposes of litigation, Blumrosen's thesis suffers also from its exclusive focus upon historical events and societal attitudes, rather than upon allegedly unlawful acts of the employer who is the defendant in the lawsuit. The plain language of Title VII indicates the Congressional intent to influence and affect the conduct of employers. The statute's prohibitions are directed at the employer's employment practices; the statute's sanctions are directed at the employer who violates the prohibitions and engages in an unlawful employment practice. The statute's remedial purpose is not so broad as to make employers liable for employment practices of others or for existing market conditions.[8]

The mere showing that plaintiffs are women occupying a sex-segregated job classification in which they are paid less than men occupying a sex-segregated job classification fails to make a prima facie case. More than this is required to implicate the defendant and to permit the drawing of an inference of impermissible acts of discrimination by the City.

■ I turn then to plaintiffs' alternative formulation that adds the fifth factor of the similarity of the requirements of the two jobs at issue to the showing that 1) plaintiffs are members of a protected class 2) who occupy a sex-segregated job classification 3) that is paid less than a 4) sex-segregated job classification occupied by men. I conclude that, unlike plaintiffs' first formulation, this model does constitute a prima facie showing. It rests upon the logical premise that jobs which are similar in their requirements of skill, effort, and responsibility and in their working conditions are of comparable value to an employer, and upon the equally logical premise that jobs of comparable value would be compensated comparably but for the employer's discriminatory treatment of the lower-paid employees.

To be explicit, I find that plaintiffs have made a prima facie case of sex discrimination by showing that (1) they are members of a protected class (2) occupying a sex-segregated job classification (3) that is paid less than a (4) sex-segregated job classification occupied by men and (5) that the two job classifications at issue are so similar in their requirements of skill, effort, and responsibility, and working conditions that it can reasonably be inferred that they are of comparable value to an employer.

Although other factors may enter into the compensation determination, it is the factors of skill, effort, responsibility and working conditions that are most commonly determinative of the wage rate.[9] By eliminating these factors in their prima facie case as an explanation for a differential in wage rates plaintiffs have eliminated the

---

would include familial and peer expectations, desire for part-time work or work with flexible hours, reluctance to pioneer in non-traditional fields, the absence of "role models" in non-traditional jobs, and lack of information about higher-paying jobs.

7. Besides nursing, those that come to mind readily are jobs in teaching and in the ministry. All have low wages in common (perhaps a vestige of the times in which these jobs were performed almost exclusively by members of religious orders), but not all are jobs held primarily by women.

8. Read literally, Blumrosen's theory would seem to make an employer liable *per se* for any wage disparity that existed between two jobs, if one was performed primarily by women and the other was performed primarily by men. She would foreclose the defendant employer from using as a defense either prevailing market rates or job evaluation surveys, on the ground that these defenses are skewed by the same anti-female (or anti-minority) biases that create the discriminatory job segregation at issue.

9. Legislative acknowledgement of this proposition may be found in the Equal Pay Act, 29 U.S.C. § 206(d)(1).

most common defense to a pay discrimination case brought pursuant to Title VII.[10]

Additionally, plaintiffs have eliminated as a nondiscriminatory explanation the independent Griffenhagen-Kroeger survey, by showing that defendant failed to adhere to the survey recommendations but instead upgraded the pay ranges for the sanitarians twice in the two years following implementation of the survey recommendations. If there is another, nondiscriminatory reason for the wage disparity, such as the employer's need to compete in the marketplace for employees with particular qualifications, the employer is in the best position to produce this information at trial.

The significance of this holding is limited by the facts of this particular case. Plaintiffs' showing does not require the court to evaluate the abstract "worth ... to society or to an employer" of one job as against another or to compare jobs that differ from one another in their requirements of effort or responsibility, cf., Gunther v. County of Washington, 20 FEP Cases 788, 791 (D.Ore. 1976) (male guards supervised more than ten times as many prisoners per guard as did female guards); or to "cross job description lines into areas of entirely different skills," cf., Lemons v. City and County of Denver, 620 F.2d 228, 229 (10th Cir. 1980) (city nurses challenged a city classification and pay plan equalizing their pay with nurses in the community whom plaintiffs contended were historically underpaid, rather than with non-nursing positions in the city's "General Administrative Series" classification allegedly of equal worth to their employer). Here plaintiffs have been able to show such a substantial similarity of work requirements and work conditions as to raise the presumption of illegal sex discrimination.

From plaintiffs' showing, it follows that plaintiffs' case survives the motion to dismiss which was made by defendant at the close of plaintiffs' case and on which a ruling was reserved. With the denial of the motion to dismiss, it becomes defendant's burden to produce evidence of legitimate, nondiscriminatory reasons for the differential in pay ranges. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. At trial, defendant adduced evidence of the higher wages paid to sanitarians working for the state, and of comparable salaries paid to municipally-employed sanitarians throughout the state. Health director Kincaid testified about the difficulties he had experienced in trying to attract qualified sanitarians to work for the City and his efforts to obtain higher salaries for this job to make recruiting easier. Also, defendants adduced evidence showing that much of the continuing pay differential between the two groups derives from the original Griffenhagen-Kroeger recommended pay differential.

This evidence raises a genuine issue of fact as to whether defendant discriminated illegally against plaintiffs. The basic two pay-range differential between the two jobs was the result of the independent Griffenhagen-Kroeger job survey; the evidence offered by Kincaid indicates that the two subsequent adjustments in the pay ranges made for the sanitarians were the result of perceived difficulties in the recruitment and retention of persons qualified to perform this particular job.

■ Plaintiffs contend that it is no defense for defendant to point to market demands (or its perception of market de-

---

**10.** Defendant attacks the sufficiency of plaintiffs' prima facie case on the ground, among others, that plaintiffs have not proven the intent necessary to sustain their claim of employment discrimination. The teaching of *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Furnco Constr. Co.*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957, and *Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 is that independent proof of intentional employer discrimination is not required of the plaintiff at the prima facie stage. It is sufficient if the probability of intentional discrimination can be inferred from the prima facie showing, as is true in this case. Of course, the plaintiffs bear the ultimate burden of persuading the court that they have been the victims of intentional discrimination, but this burden may be discharged "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

mands) as justification for upgrading the pay ranges of the male sanitarians but not the pay ranges of the public health nurses. They argue, first, that the market reflects the biases and stereotypes of the value of women's work, and, in particular, reflects the devaluation of nurses' salaries resulting from female domination of the nursing field; second, that reliance on the market has been rejected in Equal Pay Act cases and should be rejected here for similar reasons; and third, that defendant's proffered explanation of reliance on the market is suspect in view of the evidence that defendant looked to the market only in setting sanitarian salaries and not in setting nursing salaries.

I find plaintiffs' first argument unpersuasive for the reason discussed earlier in this opinion.[11] Under Title VII, an employer's liability extends only to its own acts of discrimination. Nothing in the Act indicates that the employer's liability extends to conditions of the marketplace which it did not create. Nothing indicates that it is improper for an employer to pay the wage rates necessary to compete in the marketplace for qualified job applicants. That there may be an abundance of applicants qualified for some jobs and a dearth of skilled applicants for other jobs is not a condition for which a particular employer bears responsibility.

Plaintiffs' second argument rests on decisions in Equal Pay Act cases holding that employers can not justify wage disparities between males and females performing equal work by asserting the greater difficulty of recruiting men for those jobs. *See, e.g., Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1975); *Hodgson v. Brookhaven,* 436 F.2d 719 (5th Cir. 1970). Those decisions are inapposite in a case such as this where plaintiffs are

contending not that essentially *identical* skills are required for both of the jobs at issue, but rather, that the kinds of skills are closely related and that the skills are substantially similar in the amount of education and levels of the on-the-job training required. In the cited Equal Pay Act cases, the jobs were so similar as to be interchangeable; that is, a female worker could perform the job held by male workers, if given the opportunity, and vice versa. Where, however, different skills are required for the performance of the jobs, the employer may explain and justify an apparent illegal wage disparity by showing that persons possessing the requisite skills are commanding higher wage rates in the local market. *See, e.g., Christensen v. Iowa,* 563 F.2d 353 (8th Cir. 1977) (court found no violation of Title VII on showing that university adopted wage scales recommended by an independent job evaluation study, then modified the plan to provide higher starting salaries for many physical plant employees but not for beginning clerical employees, despite fact that jobs were in same labor grade, where modifications were made in reliance upon prevailing community wage rates for similar jobs).[12]

Plaintiffs' third argument goes to the credibility of defendant's explanation and will be considered in the discussion of the sufficiency of plaintiffs' rebuttal case.

■ I am persuaded that, with the evidence of its perception that the retention of sanitarians required raising their salary ranges, defendant has rebutted the presumption raised by plaintiffs' prima facie case. Defendant's showing encompassed evidence of comparable public sector salaries for Wisconsin sanitarians, evidence that early in Kincaid's tenure, a sanitarian va-

---

11. See pp. 444–445, *supra.*

12. In *Christensen,* the district court held that the plaintiffs, female clerical employees, had not made a *prima facie* case. In my opinion, the plaintiffs' showing that the defendant university had modified the independently set starting salaries for the mostly-male physical plant employees would state a *prima facie* case, making it defendant's responsibility to come forward with the explanation of its belief that it would have to pay existing community wage rates in order to attract physical plant employees. *See* Note, Equal Pay for Comparable Work, 15 Harv.C.R.C.L.L.R. 500, n. 112 (1980).

cancy had gone unfilled for eight months, and evidence of written requests from Kincaid to the personnel director expressing Kincaid's concern over the need to improve sanitarian pay scales in order to compete with other employers for qualified sanitarians.

This showing by defendant requires plaintiffs to demonstrate, if they can, that defendant's reasons for the pay differential between the two groups are not the true reasons for the disparity between the wages paid to sanitarians and to public health nurses. As *Burdine* emphasizes, the plaintiffs retain the burden of *persuasion* throughout the case. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Once defendant meets its burden of *production* of proof, then the plaintiffs have an opportunity to challenge the validity of defendant's explanation as part of plaintiffs' ultimate burden of persuading the court that they have been the victims of discrimination motivated by illegal intent on the part of their employer.

At this third stage of the trial plaintiffs' case fails for lack of proof either that it is more likely than not that a discriminatory reason motivated defendant in creating or retaining the pay disparity between the public health nurses and the sanitarians or, alternatively, that the explanation offered by defendant is unworthy of credence. Specifically, plaintiffs did not show that defendant's upgrading of the sanitarians' pay ranges was not a response to a legitimate perception that pay increases were necessary in order to recruit and retain qualified sanitarians. Additionally, they did not prove that any acts of discrimination occurred after Title VII became applicable to defendant.

In order to show that defendant's explanation of its actions was not credible or that it was only a pretext, plaintiffs might have adduced evidence such as the size of the labor pool from which sanitarians are recruited, or evidence of the number of applicants for each sanitarian vacancy, or the average length of time such vacancies went unfilled. What plaintiffs did adduce was evidence tending to indicate that nursing vacancies occurred, that these vacancies were not always filled promptly, and that, on several occasions in 1967, the Director of Nursing had expressed concern to director Kincaid about nursing vacancies and nurses' salaries. Also, plaintiffs' point to Kincaid's statement that in the 60's he and society thought of men as the breadwinner as additional evidence of their contention that illegal, stereotypical discrimination motivated the differential in pay ranges. On the strength of this evidence, plaintiffs argue that defendant's explanation for upgrading sanitarian pay is not credible; that defendant's greater concern about sanitarian salaries and sanitarian vacancies is not a defense to the charge of sex discrimination but a reflection of its greater concern for, and its more favorable treatment of, male employees.

Plaintiffs may be accurate in their perception, but they have failed to produce the kind of hard evidence about the general availability of both sanitarians and public health nurses in the labor market during the time in question that would suffice to carry their burden of persuasion. If they wish to show that director Kincaid had no reasonable basis for his beliefs that higher salaries were necessary to retain and recruit sanitarians and not necessary to retain and recruit qualified public health nurses, they will have to show more than they have shown in this case about the relative availability of qualified nurses and sanitarians, about the occurrence and duration of vacancies in both categories of jobs, or about the relative impact of a vacancy upon the nursing staff and the sanitarian staff.[13]

By itself, Kincaid's statement may be probative of his attitudes about men's and

---

13. Defendant asserts in its brief that one sanitarian vacancy has a greater impact upon the smaller sanitarian staff of 6–7 than it would have upon the larger public health nursing staff of 20–22.

women's family responsibilities, but it does not prove that defendant's explanation of its actions is mere pretext. Even if the attitude of one department head can properly be attributed to defendant, the statement does not demonstrate that defendant made the employment decisions at issue because of its belief that men were the "breadwinners," rather than because it accepted Kincaid's view that the lower pay ranges were impeding his ability to hire qualified sanitarians.

Finally, plaintiffs have not shown that defendant acted, or failed to act, in an illegally discriminatory manner after March 24, 1972, the date on which Title VII became applicable to defendant and other public employers. Even if plaintiffs had been able to prove that defendant acted out of a discriminatory motive in making three reclassifications of the sanitarians after the original Griffenhagen-Kroeger classification while making only one reclassification of the nurses during the same period, the fact is that all of these actions took place before March 24, 1972. Plaintiffs assert that such pre-Title VII actions may imply post-act discrimination, particularly where relevant aspects of the decision-making process have undergone little change, and they cite *Hazelwood School District v. United States*, 433 U.S. 299, 309 fn. 15, 97 S.Ct. 2736, 2742 fn. 15, 53 L.Ed.2d 768 (1977) in support of this assertion. Defendant counters, correctly, that *Hazelwood* says only that evidence of pre-Title VII discrimination might *support* an inference that such discrimination had continued, and does not say that it *warrants* such an inference when it is the only evidence adduced.

Plaintiffs contend that the continuation is shown by defendant's admission that there has been no effort made by the defendant after 1972 to reevaluate job classifications to identify and eliminate sex-based stereotypes or to raise nurses' salaries to the level of the sanitarians' salaries. Plaintiffs must show more than this to prove the continuation of pre-Act discrimination. By contrast, in *IUE v. Westinghouse Electric Corp.*, 3 Cir., 631 F.2d 1094, the plaintiffs were able to demonstrate that their employer had maintained past 1964 a job grading system that embodied a 1939 classification scheme explicitly downgrading the jobs held predominantly by women. In the instant case, although plaintiffs contend that their wages carry forward the pre-Act discriminatory classification, the evidence does not lend support to this contention.

A close examination of the actual long-term differential between the two groups shows that from 1965 through 1979, the average salary increase per year to the public health nurses was $58.14 (on a per month basis); the average salary increase to the sanitarians during the same period was $65.21 (on a per month basis). Although in 1979 the public health nurses and the sanitarians were $125.73 apart in monthly salaries, almost half of that differential, or $59.00, was attributable to the Griffenhagen-Kroeger classification in 1964; the remainder averages out to a $7.07 per month differential in yearly pay increases. During the post-Act period, 1973–1979, public health nurse salaries have been increased 47%. During the same period, the sanitarian salaries have been increased 45%. These figures tend to rebut the contention that there was a correlation between pre-Act and post-Act treatment that would imply the continuation of illegal discrimination.

Further complicating the plaintiffs' task of showing such continuation are the significant changes brought about by collective bargaining and the fact that the sanitarians and public health nurses are affiliated with different unions, which bargain with defendant independently of one another and are no longer in the same compensation group.

In summary, I find and conclude that plaintiffs have failed to demonstrate that either the original, higher classification in 1963 or the additional reclassifications of the sanitarians prior to 1972 were the result of intentional illegal discrimination between

a male-dominated employee group and a female-dominated employee group; that plaintiffs have failed to show that any present salary disparity between the public health nurses and the sanitarians is the result of any illegal, intentional act of discrimination by defendant taking place after March 24, 1972; and, therefore, that plaintiffs have failed to carry their ultimate burden of persuading this court that they have been the victims of intentional discrimination made illegal under Title VII of the Civil Rights Act.

*Section 1983 and the Fourteenth Amendment*

In 1979, the Court of Appeals for the Seventh Circuit ruled that a court's evaluation of § 1983 claims in a discrimination case must be guided by the same principles which are applicable to the evaluation of Fourteenth Amendment claims in a discrimination suit. *Mescall v. Burrus*, 603 F.2d 1266, 1271 (7th Cir. 1979). Accordingly, plaintiffs' § 1983 and Fourteenth Amendment claims may be considered simultaneously.

Plaintiffs' § 1983 and Fourteenth Amendment claims are premised on the argument that defendant's practice of paying lower salaries to public health nurses, an all female category, than to sanitarians, an all male category, is a violation of the equal protection clause. Plaintiffs concede that they must prove also that defendant's actions were motivated by discriminatory intent. *Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Mescall v. Burrus*, 603 F.2d at 1271. In an effort to make this showing, plaintiffs rely on the argument made in support of their Title VII

claim. They allege that their jobs as public health nurses are substantially similar to the jobs of sanitarians, that defendant's practice of paying public health nurses, a predominantly ·female classification less than sanitarians, a predominantly male classification, is a violation of Title VII, and that this proof of intentional sex discrimination under Title VII satisfies the requirement of discriminatory purpose under the Fourteenth Amendment.

In this instance, where I have found that plaintiffs failed to establish proof of intentional sex discrimination under Title VII, plaintiffs cannot rely on their Title VII claim to establish the requirement of discriminatory purpose. Plaintiffs do not offer any other argument, or cite any other evidence, to demonstrate that a discriminatory purpose influenced the City's classification practice, and I am not aware of any evidence in the record that demonstrates such a purpose. Indeed, the impediment to plaintiffs' equal protection claim is similar to the impediment to plaintiffs' Title VII claim: plaintiffs are unable to implicate the City in an unlawful employment practice or in discriminatory purpose. In the absence of the latter showing, I cannot conclude that the defendant has violated the equal protection clause.

Accordingly, I find that plaintiffs have failed to state a claim for relief under § 1983 or the Fourteenth Amendment.

## ORDER

For the reasons discussed above, IT IS ORDERED that defendant's motion to dismiss plaintiffs' case is DENIED; judgment on the merits is granted in favor of defendant.

APPENDIX

TABLE A

City of Madison Public Health Department Salaries (in pertinent part)

| | 1958 | 1962 | 1964 | 1965 | 1966 | 1967 | 1969 | 1970 | 1977 |
|---|---|---|---|---|---|---|---|---|---|
| Public Health Nurse I | Range 13 $361 Min.-$417 Max. Public Health Nurse I | Range 13 $401 Min.-$458 Max. Public Health Nurse I | — | — | — | — | — | — | — |
| Public Health Sanitarian I | Range 14 $381 Min.-$442 Max. Public Health Sanitarian I | Range 14 $421 Min.-$484 Max. Public Health Sanitarian I | Range 16 $202 Min.-$246 Max. Public Health Sanitarian I | Range 16 $208 Min.-$252 Max. Public Health Sanitarian I | Range 16 $215 Min.-$261 Max. Public Health Sanitarian I | Range 16 $233 Min.-$273 Max. Public Health Sanitarian I | Range 12 $266.50 Min.-$306.50 Max. Public Health Sanitarian I | Range 12 (Local 60 Comp. Group) $296.50 Min.-$336.50 Max. Public Health Sanitarian I | — |
| Public Health Nurse | Range 15 $406 Min.-$467 Max. Public Health Nurse II | Range 15 $448 Min.-$511 Max. Public Health Nurse II | Range 17 $212 Min.-$258 Max. Public Health Nurse | Range 17 $218 Min.-$265 Max. Public Health Nurse | Range 17 $226 Min.-$274 Max. Public Health Nurse | Range 17 $243 Min.-$286 Max. Public Health Nurse | Range 14 $286.50 - $335.00 Public Health Nurse | Range 14 (Basic salary schedule) $316.50 Min.-$365.00 Max. Public Health Nurse | Range 02 Comp. Group 22 $482.05 Min.-$555.91 Max. Public Health Nurse |
| Public Health Sanitarian II | Range 16 $422 Min.-$488 Max. Public Health Sanitarian II | Range 17 $489 Min.-$557 Max. Public Health Sanitarian II | Range 19 $234 Min.-$284 Max. Public Health Sanitarian II | Range 19 $240 Min.-$292 Max. Public Health Sanitarian II | Range 20 $261 Min.-$317 Max. Public Health Sanitarian II | Range 21 $286 Min.-$345 Max. Public Health Sanitarian II | Range 17 $320.30 Min.-$384.00 Max. Public Health Sanitarian II | Range 17 (Local 60 Comp. Group) $349.50 Min.-$414.00 Max. Public Health Sanatarian II | Range 17 Comp. Group 16 $531.25 Min.-$625.92 Max. Public Health Sanitarian II |

TABLE B

SALARY COMPARISON

PUBLIC HEALTH NURSE/PUBLIC HEALTH SANITARIAN

WISCONSIN CITIES

1965 – 1970

| | 1965 | | | 1966 | | | 1967 | | | 1968 | | | 1969 | | | 1970 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. |
| Madison | $574 | $633 | 10% | $594 | $687 | 16% | $620 | $748 | 21% | $648 | $784 | 21% | $726 | $832 | 15% | $791 | $897 | 13% |
| Beloit | 528 | 528 | 0% | 650 | 589 | -9% | 687 | 687 | 0% | 731 | 731 | 0% | 774 | 774 | 0% | 820 | 820 | 0% |
| Dane County | | | | | | | | | | | | | 759 | 825 | 9% | 820 | 889 | 8% |
| Eau Claire | 570 | 546 | -4% | 598 | 598 | 0% | 621 | 595 | -4% | 596 | 675 | 13% | 625 | 796 | 27% | | | |
| Fond du Lac | 455 | 620 | 36% | 500 | 685 | 37% | 649 | 605 | -7% | 605 | 630 | 4% | 695 | 695 | 0% | 752 | 765 | 2% |
| Green Bay | | | | | | | 600 | 650 | 8% | 575 | 625 | 9% | 650 | 725 | 12% | 715 | 770 | 8% |
| Janesville | 470 | 575 | 22% | 540 | 625 | 16% | 600 | 660 | 10% | 645 | 734 | 14% | 618 | 799 | 29% | 618 | 799 | 29% |
| Kenosha | 600 | 650 | 8% | 600 | 650 | 8% | | | | 649 | 711 | 10% | 684 | 746 | 9% | | | |
| LaCrosse | 510 | 535 | 5% | 600 | 650 | 8% | 578 | 578 | 0% | 587 | 587 | 0% | 669 | 859 | 28% | 651 | 762 | 17% |
| Manitowoc | 452 | 549 | 21% | 377 | 548 | 45% | 555 | 720 | 30% | 555 | 720 | 30% | 490 | 690 | 41% | | | |
| Marinette | 490 | 417 | -15% | 510 | 417 | -18% | 530 | 487 | -8% | 556 | 519 | -7% | 600 | 553 | -8% | 642 | 592 | -8% |
| Milwaukee | 609 | 609 | 0% | 629 | 629 | 0% | 706 | 706 | 0% | 728 | 728 | 0% | 834 | 823 | -1% | 877 | 912 | 4% |
| Oshkosh | 483 | 587 | 22% | 495 | 602 | 22% | 545 | 626 | 15% | 572 | 657 | 15% | 632 | 696 | 10% | 700 | 752 | 7% |
| Racine | 517 | 563 | 9% | 534 | 581 | 9% | 600 | 646 | 8% | 639 | 688 | 8% | 736 | 736 | 0% | | | |
| Sheboygan | 496 | 546 | 10% | 546 | 600 | 9% | 600 | 630 | 5% | 645 | 678 | 5% | 688 | 756 | 10% | 757 | 832 | 10% |
| Stevens Point | | | | | | | | | | | | | | | | | | |
| Superior | 480 | 425 | -11% | | | | 505 | 450 | -11% | | | | | | | 526 | 547 | 4% |
| Wausau | 575 | 555 | -3% | | | | 599 | 578 | -4% | 649 | 603 | -7% | 688 | 665 | -3% | 729 | 725 | -5% |
| Wauwatosa | 525 | 717 | 37% | 545 | 738 | 35% | 578 | 782 | 35% | 619 | 858 | 39% | 675 | 906 | 34% | 706 | 750 | 6% |
| West Allis | 548 | 597 | 9% | 610 | 628 | 3% | 641 | 659 | 3% | 683 | 816 | 19% | 723 | 842 | 16% | 787 | 766 | -3% |

| | 1971 | | | 1972 | | | 1973 | | | 1974 | | | 1975 | | | 1976 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. |
| Madison | $850 | $964 | 13% | $897 | $1017 | 13% | $937 | $1063 | 13% | $994 | $1127 | 13% | $1073 | $1217 | 13% | $1137 | $1286 | 13% |
| Beloit | 852 | 894 | 5% | 887 | 1189 | 34% | 931 | 1248 | 34% | 977 | 1310 | 34% | 1082 | 1136 | 5% | 1106 | 1161 | 5% |
| Dane County | 869 | 942 | 8% | 913 | 986 | 8% | 958 | 1035 | 8% | 1016 | 1097 | 8% | 1119 | 1234 | 10% | 1169 | 1290 | 10% |
| Eau Claire | 854 | 854 | 0% | | | | 910 | 1169 | 28% | | | | | | | | | |
| Fond du Lac | 804 | 818 | 2% | 852 | 867 | 2% | 904 | 920 | 2% | 962 | 980 | 2% | 1049 | 1069 | 2% | 1070 | 1090 | 5% |
| Green Bay | 745 | 800 | 7% | 785 | 840 | 7% | 815 | 880 | 8% | 853 | 930 | 9% | 929 | 1012 | 9% | 1162 | 1349 | 16% |
| Janesville | 846 | 983 | 16% | 891 | 1034 | 16% | 936 | 1088 | 16% | 999 | 1159 | 16% | 1107 | 1285 | 16% | | | |
| Kenosha | 585 | 675 | 15% | 833 | 869 | 4% | 790 | 810 | 2% | 790 | 852 | 8% | 991 | 1075 | 8% | 1080 | 1122 | 4% |
| LaCrosse | 687 | 687 | 0% | 728 | 1009 | 39% | 752 | 1033 | 37% | 763 | 1046 | 37% | 833 | 1140 | 37% | 921 | 1175 | 28% |
| Manitowoc | 700 | 646 | -8% | 737 | 680 | -8% | 773 | 713 | -8% | 830 | 765 | -8% | 820 | 1120 | 37% | 920 | 1201 | 30% |
| Marinette | 934 | 971 | 4% | 994 | 1031 | 4% | 1044 | 1085 | 4% | 1077 | 1118 | 4% | 1172 | 1218 | 4% | 1265 | 1326 | 5% |
| Milwaukee | 756 | 812 | 7% | 763 | 819 | 7% | 804 | 865 | 8% | 873 | 940 | 8% | 943 | 1016 | 8% | 1008 | 1088 | 8% |
| Oshkosh | 793 | 834 | 5% | 833 | 869 | 4% | 878 | 857 | -2% | 926 | 1016 | 4% | 991 | 991 | 0% | 1080 | 1122 | 4% |
| Racine | 801 | 875 | 9% | 842 | 920 | 9% | 881 | 959 | 9% | 933 | 1016 | 9% | 1002 | 1089 | 9% | 905 | 1078 | 19% |
| Sheboygan | 835 | 835 | 0% | 885 | 885 | 0% | 934 | 931 | -3% | 1011 | 980 | -3% | 1108 | 1220 | 10% | 1180 | 1300 | 10% |
| Stevens Point | 551 | 577 | 5% | 635 | 612 | -4% | 662 | 639 | -4% | 611 | 683 | 12% | 717 | 748 | 4% | 780 | 808 | 4% |
| Superior | 774 | 770 | -5% | 822 | 818 | -4% | 861 | 856 | -6% | 900 | 895 | -6% | | | | | | |
| Wausau | 760 | 795 | 5% | 816 | 853 | 4% | 883 | 1007 | 14% | 939 | 1071 | 14% | 1033 | 1395 | 35% | 963 | 1025 | 6% |
| Wauwatosa | 842 | 820 | -3% | 892 | 875 | -2% | | | | 1004 | 969 | -3% | | | | 1116 | 1506 | 35% |
| West Allis | | | | | | | | | | | | | | | | | | |

| | 1977 | | | 1978 | | | 1979 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | PHN | PHS | % Dif. | PHN | PHS | % Dif. | PHN | PHS | % Dif. |
| Madison | $1204 | $1356 | 13% | $1290 | $1443 | 12% | $1381 | $1546 | 12% |
| Beloit | 1172 | 1229 | 5% | 1243 | 1302 | 5% | 1327 | 1394 | 5% |
| Dane County | 1238 | 1369 | 11% | 1325 | 1464 | 10% | 1417 | 1567 | 11% |
| Eau Claire | 1139 | 1139 | 0% | | | | 1307 | 1318 | .8% |
| Fond du Lac | 1160 | 1181 | 2% | 1238 | 1255 | 1% | 1323 | 1344 | 2% |
| Green Bay | 1140 | 1177 | 3% | 1215 | 1277 | 5% | 1307 | 1366 | 4% |
| Janesville | 1233 | 1432 | 16% | 1361 | 1361 | 0% | | | |
| Kenosha | 1155 | 1167 | 1% | | | | 1387 | 1440 | 4% |
| LaCrosse | 972 | 948 | –2% | 1041 | 1147 | 10% | | | |
| Manitowoc | | | | | | | | | |
| Marinette | | | | | | | | | |
| Milwaukee | 1313 | 1374 | 5% | 1364 | 1428 | 5% | 1452 | 1521 | 5% |
| Oshkosh | 1051 | 1132 | 6% | 1127 | 1212 | 8% | 1242 | 1337 | 8% |
| Racine | 1171 | 1167 | –.3% | 1284 | 1333 | 4% | 1387 | 1440 | 4% |
| Sheboygan | 1135 | 1232 | 9% | 1212 | 1316 | 9% | 1295 | 1406 | 9% |
| Stevens Point | 1264 | 1264 | 0% | 1352 | 1352 | 0% | 1447 | 1447 | 0% |
| Superior | | | | | | | | | |
| Wausau | | | | | | | 1339 | 1339 | 0% |
| Wauwatosa | 1171 | 1336 | 14% | 1229 | 1193 | –3% | 1315 | 1500 | 14% |
| West Allis | 1156 | 1170 | 1% | 1258 | 1229 | –2% | 1340 | 1306 | –2% |

PHN = Maximum Monthly Salary for Public Health Nurse, excluding longevity benefits, if any.

PHS = Maximum Monthly Salary for Public Health Sanitarian, excluding longevity benefits, if any.

% Dif. = The difference between the salaries of PHN and PHS expressed as a percentage of the PHN maximum base wage.

All Nurse and Sanitarian salaries shown represent the Level II wage, where available.

Where conversion from a bi-weekly to a monthly salary was necessary, the bi-weekly salary was multiplied by a constant of 2.166 and the result rounded to the nearest dollar.