**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**CLAY COUNTY RURAL TELEPHONE, INC., Defendant.**

**No. TH 87–50–C.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Sept. 8, 1988.

R. Anthony Prather, E.E.O.C., Indianapolis, Ind., for plaintiff.

John T. Neighbours, Gayle L. Skolnik, Gregory J. Utken, Baker & Daniels, Indianapolis, Ind., for defendant.

## ENTRY

TINDER, District Judge.

This cause comes before the court on the defendant's motion for summary judgment. Having read and considered this motion and the materials and documents filed in support of and in opposition thereto, and being duly advised, the court finds for the reasons set forth below that the defendant's motion should be GRANTED in part and DENIED in part.

## I. PLAINTIFF'S CLAIMS AND STANDARDS FOR SUMMARY JUDGMENT

The Equal Employment Opportunity Commission ("EEOC") commenced this action against the defendant, Clay County Rural Telephone, Inc. ("CCRT"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") claiming that in 1985 CCRT failed to provide one of its employees, Linda Owens, with a raise because of her sex and that CCRT retaliated against Owens because she had filed a charge of sex discrimination with the EEOC.

CCRT moves for summary judgment. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court may grant summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The party moving for summary judgment has the burden of establishing that no genuine issue[1] as to any material

---

1. A genuine issue of material fact exists if there is sufficient evidence favoring the non-moving

fact[2] exists and that the movant is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Arkwright–Boston Manufacturers v. Wausau Paper Mills Co.*, 818 F.2d 591, 593 (7th Cir.1987). The movant's burden can be broken down into two distinct components: the initial burden of production and the ultimate burden of persuasion. *See* 10A Wright, Miller & Kane, Federal Practice and Procedure § 2727 (2d ed. 1983); *see also Celotex*, 477 U.S. at 330, 106 S.Ct. at 2556 (BRENNAN, J., dissenting). The burden of production requires the movant to make a prima facie showing that it is entitled to summary judgment. 10A Wright, Miller & Kane § 2727, p. 143. If, as in the present case, the non-moving party has the ultimate burden of persuasion at trial, the party moving for summary judgment may satisfy its burden of production in either of two ways. First, the movant may submit affirmative evidence which negates an essential element of the non-moving party's claim. *Celotex*, 477 U.S. at 331, 106 S.Ct. at 2557 (BRENNAN, J., dissenting). Second, the moving party may identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits which demonstrate that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. *Id.* at 323, 106 S.Ct. at 2553 (REHNQUIST, J.) and 477 U.S. at 331, 106 S.Ct. at 2557 (BRENNAN, J., dissenting); 10A Wright, Miller & Kane, § 2727, pp. 130–131.[3] If the moving party adopts this second option, a conclusory assertion that the non-moving party has no evidence is insufficient. *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2551

(WHITE, J., concurring) and 477 U.S. at 382, 106 S.Ct. at 2557 (BRENNAN, J., dissenting). "[T]he moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the non-moving party." *Id.*

Once the movant satisfies his or her burden of production concerning summary judgment, the burden of producing evidence shifts to the party opposing the motion. 10A Wright, Miller & Kane § 2727, p. 143–45. At this point, Rule 56(e) prohibits the non-moving party from resting upon mere allegations, conclusory statements, or assertions of belief rather than fact, and requires the non-moving party to designate specific facts by affidavits, depositions, answers to interrogatories and admissions on file showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir.1987). The non-moving party must do more than simply show some metaphysical doubt as to the material facts, *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, or produce evidence that is merely colorable or not significantly probative. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. The non-moving party bearing the burden of proof at trial must produce sufficient evidence favoring his position such that a reasonable jury could return a verdict for him. *Id.* Thus, the court's inquiry when ruling on a motion for summary judgment in the run-of-the-mill civil case is whether a jury could reasonably find either that the plaintiff proved his case by a preponder-

party for a reasonable trier of fact to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

2. The materiality of the facts is identified by the substantive law to be applied in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment." *Id.; see also Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir.1987).

3. The majority and the dissent in *Celotex* agreed as to how the summary judgment burden of proof operates; they disagreed as to how the standard applied to the facts of the case. The dissent merely elaborated more fully on the way in which the burden of production shifts between the parties and how it can be satisfied. 10A Wright, Miller & Kane, § 2727, p. 21–22 (2d ed. 1987 supp.).

ance of the evidence or that he did not. *See, Id.* at 254–55, 106 S.Ct. at 512–13; *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987). When the non-moving party fails to make a showing sufficient to establish the existence of an element to his case, he cannot withstand a motion for summary judgment as there is "no genuine issue as to any material fact." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2553; *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725, 728 (7th Cir.1987).

Although the summary judgment burden of production may shift from the movant to the non-moving party, the burden of persuasion always remains on the movant. 10A Wright, Miller & Kane § 2727. This burden is a stringent one. 6 Moore's Federal Practice ¶ 56.15[3], pp. 56–466; 10A Wright, Miller & Kane § 2727, p. 124. Because the summary judgment burden of persuasion is always on the movant, the court must believe all the evidence of the non-movant, view the inferences to be drawn from the underlying facts in a light most favorable to the non-movant,[4] and resolve any doubt as to the existence of a genuine issue for trial in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Furthermore, the court is obliged to take into account the entire setting of the case and must consider all papers of record as well as any material prepared for the motion when determining whether the movant has satisfied his or her burden of persuasion. *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 930 (1st Cir.1983); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980); 10A Wright, Miller & Kane § 2721, p. 44. This inquiry must be made with caution; the court may deny summary judgment if there is reason to believe that the better course would be to proceed to a full trial.

*Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

Guided by the above principles, the court evaluates the merits of CCRT's motion for summary judgment.

## II. SEX DISCRIMINATION

The EEOC's first claim is that in 1985 CCRT failed to provide Linda Owens with a raise and decreased her salary because of her sex in violation of section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1). CCRT moves for summary judgment contending that (1) the EEOC cannot establish a prima facie case of sex discrimination; (2) there were legitimate nondiscriminatory reasons for the determination of Owens' 1985 salary; and (3) the EEOC is unable to show that the reasons for Owens' salary determination are a pretext for sex discrimination.

### A. *Facts*

CCRT has presented the court with evidence of the following facts pertinent to this claim. CCRT is a rural telephone cooperative located in Cloverdale, Indiana. Linda Owens began working at CCRT in 1975 and has been employed as a secretary-receptionist, a PBX operator, the Service Order Coordinator, and the Business Office Supervisor. In 1979, she was promoted to the position of Customer Service Manager, succeeding Joe Scott. Owens has held the position of Customer Service Manager at all times material to this litigation.

CCRT's operations are overseen by a Board of Directors, the members of which are customers themselves and not employees of CCRT. There is a total of seven Board members who are elected at staggered intervals. The general day-to-day management and operation of CCRT is the responsibility of the General Manager. Since December of 1984, James McLean has served as the General Manager. He reports directly to the Board of Directors

---

4. Although all inferences must be drawn in a light most favorable to the non-movant, the court will draw only those inferences that are reasonable. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312–13 (7th Cir.1986).

and is responsible for planning, directing, and coordinating the business of CCRT within the guidelines established by the Board of Directors. Organizationally, the Controller, the Plant Manager and the Customer Service Manager report directly to the General Manager. Specifically, the General Manager's responsibilities and duties include, but are not limited to:

1. Supervising the Controller, Plant Manager and Customer Service Manager;

2. Developing relationships with regulatory agencies, connecting companies, associations, suppliers and other participants in the industry in order to keep abreast of new laws, regulations, products, methods, technology and ideas;

3. Advising and assisting the Board in formulating a sound financial company policy;

4. Managing all company planning in the areas of finance, property management, service, market position, operations, personnel reorganization, commercial, public relations and controls;

5. Developing and maintaining a complete organizational structure to accomplish company objectives;

6. Directing all activities necessary to achieve company objectives;

7. Administering the overall financial affairs of the company in accordance with Board policies and directives;

8. Ensuring compliance with approved policies and applicable regulatory agency rules and regulations;

9. Providing guidance, direction and leadership to all employees;

10. Serving as an advisor to the Board to assist the Board in the formulation and establishment of objectives, policies, programs and budgets;

11. Providing information as needed by counsel;

12. Representing the company in public and community functions;

13. Developing and maintaining personnel development and training programs;

14. Assuming responsibility for the supervision of all outside plant construction and maintenance programs;

15. Assuming responsibility for the establishment of adequate internal control practices and procedures and the maintenance of all necessary books and records of the company; and

16. Keeping subscribers informed of company activities and fostering good relations between the company and its subscribers.

The General Manager must possess (1) a degree, or the appraised equivalent of a degree, in Business Administration, (2) a minimum of ten years experience in all phases of telephony, and (3) a thorough knowledge of company organization, administration, standards, regulations, rules, and industry concepts.

The Controller is generally responsible for the management and operation of CCRT's Data Processing and Accounting Departments. Specifically, the Controller's responsibilities and duties include, but are not limited to:

1. Training, supervising, and evaluating the programmers, computer operators, accountants and accounting clerks;

2. Coordinating with the Commercial and Plant Departments to provide necessary support by the use of electronic data processing and to establish necessary accounting and business controls;

3. Supervising cash management, budget controls and oversight;

4. Coordinating closely with connecting companies to enable the orderly flow of financial data relating to revenue requirements and cost studies;

5. Coordinating closely with industry suppliers, associations and regulatory bodies to investigate and gain knowledge of new products, technol-

ogies, techniques, rules and regulations;

6. Coordinating temporary cash investments with various banking institutions;

7. Monitoring accounting and internal control procedures;

8. Preparing and monitoring annual operating budgets;

9. Supervising the preparation of revenue requirement studies, cost studies, and accounting exhibits for regulatory proceedings;

10. Planning data processing operations and coordinating these operations with outside computer centers;

11. Developing system application designs and program writing for new and complex computer applications; and

12. Acting as the General Manager when the General Manager is absent.

Educational requirements for this position include a degree in Accounting, Business Administration, and Computer Science or the suitable qualifications to be licensed as a Public Accountant or Certified Public Accountant. The Controller is also required to possess (1) at least five years experience in public, utility, or governmental accounting, as well as data processing; (2) an aptitude, interest, and training in Mathematics, Computer Programming, Financial Management, Statistics, and Business Economics; and (3) experience in managing employees and interacting with other operating groups and departments. At all times material to this litigation, the Controller was Robert Lowes.

The Plant Manager is responsible for the operation of the Plant Department. This position's duties and responsibilities include, but are not limited to:

1. Supervising central office engineers, construction employees, and installation and repair employees;

2. Coordinating with the Engineering, Commercial, and Service Departments concerning problems affecting the service of the company;

3. Planning, developing, and making recommendations on departmental organizations, staff, employee developments, safety, job training, and short and long-range work programs;

4. Selecting staff and making periodic appraisals of their performance;

5. Studying monthly computer printouts for the Central Office and the Construction and Installation and Repair Departments to identify problems;

6. Determining the priority of job orders and the number of workers assigned to those orders;

7. Developing and maintaining a system of trouble reporting for repair service;

8. Initiating or recommending the purchase of equipment, tools and supplies; and

9. Receiving phone calls at any hour of the day or night concerning problems with the subscribers' service.

The Plant Manager is required to have a high school diploma and some formal technical schooling. The Plant Manager must also (1) have at least five years in telephone management, (2) have a working knowledge of all materials and equipment in various departments, (3) be able to make decisions on what new equipment should be recommended for purchase, (4) be aware of company and REA specifications, (5) be able to draw, read, and understand staking sheets, field maps, assignment sheets, and circuit diagrams, and (6) be capable of attaining the full concept of total plant operations. At all times material to this litigation the Plant Manager was Steve Dunagan.

The Customer Service Manager is responsible for the activities of the Commercial Office and the Warehouse. The Customer Service Manager's responsibilities and duties include, but are not limited to:

1. Representing the company in business contacts relative to the customers;

2. Supervising all of the employees assigned to the Commercial Office

(service representatives)[5] and Warehouse;

3. Ensuring the accuracy of the commercial records concerning billing, installation, removals, changes in customer service, and disconnection of services for non-payment;

4. Establishing a method for collection of payments;

5. Ensuring publication of the directory;

6. Establishing and maintaining a close working relationship with all departments of CCRT;

7. Staying abreast of changes and new products in the industry;

8. Maintaining a working knowledge of CCRT's practices, tariffs and procedures;

9. Maintaining a working knowledge of Public Service Commission Rules and Standards;

10. Preparing a budget for the Commercial Office and Warehouse;

11. Working with advertisers; and

12. Working with customers, attorneys, and courts on collections.

The Customer Service Manager is required to have at least a high school diploma with a Business major. Courses in management training are considered helpful. The Customer Service Manager is also required to have (1) at least five (5) years of telephone experience, (2) an aptitude, interest and training in the area of public contact, and (3) knowledge of telephone rates and tariffs.[6]

The salaries and wages for CCRT employees are reviewed and adjusted in late March of each year. Adjustments become effective in April of the year. The President of the Board of Directors appoints a Wage and Salary Committee from among its members. The Committee is responsible for making wage and salary recommendations to the full Board for its review and final approval. Since the President of the Board appoints the Committee, he or she has the right to sit in on the Committee's meetings. The General Manager assists the Committee by providing information and by making initial salary recommendations for the Committee's consideration. The General Manager does not decide what the final recommendation to the Board of Directors will be, nor does he make the final decision on wage and salaries to be paid. These are the responsibilities of the Wage and Salary Committee and Board of Directors, respectively.

The Wage and Salary Committee ("the Committee") for the April, 1985, adjustments consisted of Michael Roach and Ivan D. Moon of the Board of Directors. Roach was the Chairman of the Committee. Prior to April of 1985, pay adjustments had been based on individual merit recommendations made by the previous General Manager, Harley Janssen. McLean followed the same pattern and made initial suggestions for each employee's 1985 pay to the Committee. McLean initially recommended that the Controller receive an increase of $.45 an hour; that the Plant Manager receive an increase of $.46 an hour; and that the Customer Service Manager receive an increase of $.12 an hour.

As part of the process for deciding the April, 1985, pay levels, the Committee reviewed existing wages of employees and their past increases. They observed a lack of a pattern or consistency to the pay rates and in many cases employees in the same job positions with less service were being paid more than those with more service. The Committee desired to bring the wages of the hourly employees in line with a multi-step progression rate structure and to establish some internal relationship for salaried jobs compared to the hourly jobs. They believed that such a system or structure would resolve inequities present in the merit pay system and enable across-the-board pay increases to be given to all em-

---

5. Service representatives take orders for telephone service from new and existing customers. They also handle payment of customer bills.

6. CCRT presents evidence of the duties, responsibilities and qualifications of the company's managerial positions through the affidavit of General Manager McLean and the printed job descriptions for each of these positions.

ployees each year. The Committee set aside McLean's initial suggestions and began working on a new wage and salary system to achieve those goals.

To establish an internal wage structure among hourly and various salary positions, an organizational block diagram was prepared showing an internal hierarchy of positions in each area. Job positions at CCRT were classified either as clerical or plant craft depending on the nature of the work performed. The Committee began the pay review process by determining an appropriate new wage progression schedule for hourly plant craft and hourly clerical job positions. They determined that the top plant craft rate after 49 months of service be $11.10 an hour and that the top clerical rate after 49 months of service should be $8.35 an hour. These base rates for plant craft and clerical positions were fairly comparable to the rates for those types of positions at GTE and Indiana Bell. GTE and Indiana Bell are local telephone companies which operate in Indiana.

After establishing the two hourly wage progression scales, hourly employees were slotted into that scale based on their months of service. If an hourly employee currently was being paid below that progression scale, his or her wages were increased to meet the scale. If an hourly employee also served in the capacity of a group leader, he or she was to paid an additional $.25 per hour.

The Committee's recommendations for salaried positions began with a base rate for each salaried position equivalent to the top hourly rate for either plant craft or clerical depending on whether the salaried job fell in the clerical or in the plant craft area. The Committee then added to the respective base hourly rate sums of money to reflect the hierarchy of positions (i.e., additional duties, expertise, responsibility or education). The additional amounts of money were based on what the Committee felt was fair and appropriate budget-wise. In each case, the Committee made a judgment as to the relative value of that position in an internal organizational hierarchy expressed in terms of a dollar and cents hourly wage differential. Job positions were analyzed not individuals.

Salaried positions that reported to the Controller began with the top clerical hourly rate as their base rate. Additional amounts then were added to each position based on the hierarchy of jobs and responsibility. The Committee recommended the following structure:

| Staff Analyst | — | Clerical rate |
|---|---|---|
| Accounting Clerk | — | $1.00 an hour above Clerical rate |
| Access Accountant and Accountant | — | $2.00 an hour above Accounting |
| Computer Operator | — | $1.00 an hour above Clerical rate |
| Computer Programmer | — | $.50 an hour above Computer Operator |
| Data Processing Assistant | — | $2.00 an hour above Computer Operator |
| Controller | — | $6.30 an hour above Data Processing Assistant |

The Controller's current salary was $36,504 ($17.55 an hour). Applying this internal structure, the Committee decided to recommend a $.10 an hour increase ($208 a year) for a new salary of $36,712.

The Plant Manager's base rate was the top plant craft hourly rate. The Committee recommended that an appropriate differential between the Plant Manager's rate and the top plant-craft rate be $3.50 an hour. This would make the Plant Manager proposed rate $14.60 an hour (top plant craft rate of $11.10 plus $3.50) or $30,368 annually. The incumbent, Dunagan, was being paid $30,243 ($14.54 an hour). Therefore, a $.06 an hour increase ($125 a year) was proposed for Dunagan.

With respect to the position of Customer Service Manager, the Committee recommended a differential of $2.50 above the top hourly clerical rate. Applying the internal structure would make the Customer Service Manager rate $10.85 an hour (top clerical $8.35 plus $2.50) for a salary of $22,568. However, the employee holding that position (Owens) already was being paid $27,996 a year ($13.46 an hour). The Committee believed Owens was being paid more than the duties of her job warranted and too far above her subordinates under this internal structure. They decided to recommend that her rate be reduced to the $10.85 hourly rate.

The positions of Business Office Supervisor and Administrative Secretary were held by employees Elizabeth Hinton and Dorothy Klein.[7] Those individuals were being paid an hourly rate ($9.24 and $8.89, respectively) in excess of the top clerical rate of $8.35. The Committee decided to recommend that Klein's rate be reduced to the top clerical rate of $8.35 and that Hinton's rate be reduced to $8.60 ($.25 was added in Hinton's case to reflect additional responsibilities).

After establishing this internal structure and the proposed pay rates, Roach reviewed annual salary information reported in the 1984 National Telephone Cooperative Association ("NTCA") Benefits and Compensation Guide. The purpose was to determine whether the structure that had just developed was within reason or "within the ballpark" when compared to average salaries paid to comparable positions at other telephone cooperatives. Roach considered the NTCA information with regard to the positions of Controller, Plant Superintendent, and Commercial Manager. He reviewed the average salaries for these positions in the United States, in the Northeast Region, for companies with $2–5 million in revenue and for companies with 5–10,000 subscribers, presumably because CCRT was in those revenue and subscriber ranges. He also looked at these figures for the 75th percentile. The pay for these three positions in the various categories was as follows:

| | NTCA Controller Avg. Pay | NTCA Plant Supt. Avg. Pay | Commercial Manager Avg. Pay |
|---|---|---|---|
| United States | 38,612 | 30,248 | 24,727 |
| Northeast Region | 38,452 | 29,188 | 25,101 |
| $2–5 Million Revenues | 41,422 | 36,019 | 26,848 |
| 5–10,000 Subscribers | 39,873 | 34,561 | 26,399 |

| | NTCA Controller 75th Percentile | NTCA Plant Supt. 75th Percentile | NTCA Commercial Manager 75th Percentile |
|---|---|---|---|
| United States | 47,400 | 34,940 | 30,160 |
| Northeast Region | 48,464 | 34,300 | 30,160 |
| $2–5 Million Revenues | 51,002 | 40,320 | 32,631 |
| 5–10,000 Subscribers | 48,464 | 40,680 | 32,651 |

Since, the NTCA descriptions for Controller and Commercial Manager included several duties or responsibilities not in CCRT's description for Controller and Customer Service Manager, Roach subtracted $2,000 from the NCTA amounts for the comparison.

After Roach reviewed the NTCA information, the Wage and Salary Committee presented its recommendations to the full Board of Directors for consideration and approval. The Board rejected them because of the pay reductions recommended for Hinton, Klein and Owens.

The Committee considered the matter again. They decided to recommend that Hinton and Klein's salaries remain at their current level because their existing wage differentials were not extremely far out of line with the top clerical rate. They also recommended that their pay be frozen or red-circled until such time as the top clerical rate reached their red-circled rate. With respect to the Customer Service Manager position, the Committee decided to recommend that the differential between the pay of the employee (Owens) holding that position and the top clerical rate be increased from $2.50 an hour to $3.50. This figure would equate to $11.85 an hour or a salary of $24,648. They decided not to recommend a wage freeze at Owens' existing level of pay as this level was still too

7. Dorothy Klein has since married and changed her last name to Janssen.

far out of line compared to the people she supervised. ($5.11 over the top clerical rate). The Committee also decided to recommend that Owens' pay be frozen or red-circled until such time as the top clerical rate reached a level that was $2.50 below her red-circled pay rate (*i.e.*, $9.35) and that should Owens ever leave the Customer Service Manager job, the pay for the position would revert to a rate $2.50 above the top clerical rate.

The Committee's amended proposals and recommendations were presented to and approved by the Board. All wages and salary adjustments were made retroactive to April 1, 1985. As a result of the Board's approval of the proposal, Owens was the only one of CCRT's 31 employees to receive a decrease in her wages in 1985. All of the other employees, except Hinton and Klein, received raises. Of the eight employees who received raises of over $1,000.00, five were women. The three largest pay increases were given to women.[8]

On April 15, 1985, McLean informed Owens that her salary was being reduced. He told her that her wages were cut because the board of Directors felt she was making too much money and they wanted her wages more in line with the NTCA guidelines.

On June 6, 1985, Owens filed a charge of sex discrimination (Charge No. 053851956) with the EEOC that she was denied a pay increase in April of 1985 because she was a female. CCRT received notice of this charge prior to June 18, 1985.

### B. *Prima Facie Case of Sex Discrimination*

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). Title VII claims may be pursued under either a disparate treatment or a disparate impact analysis. The EEOC's claim is one alleging disparate treatment. The factual inquiry in the disparate treatment cases is whether the defendant intentionally discriminated against its employee on account of sex or another characteristic covered by the statute. *United States Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Benzies v. Illinois Dept. of Mental Health*, 810 F.2d 146, 148 (7th Cir.) *cert. denied*, —— U.S. ——, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). Discriminatory intent must be a "but for" cause of the action taken by the defendant. *Germane v. Heckler*, 804 F.2d 366, 368 (7th Cir.1986); *McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 928 (7th Cir.1984); *see also Benzies*, 810 F.2d at 148 ("Unless the employer acted for a reason prohibited by the statute, the plaintiff loses."). A plaintiff may establish intentional discrimination either by direct proof or via the three step method of indirect proof outlined in *Burdine* and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir.1987). Under the indirect method of proof, the plaintiff first has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. If the plaintiff succeeds in proving the prima facie case, a rebuttable presumption arises and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its employment action. *Id.; McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Should the defendant carry this burden, the presumption raised by the prima facie case is rebutted. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095. The plaintiff must then prove by a preponderance of the

---

**8.** Most of CCRT's evidence concerning the salary adjustments of April, 1985 is presented through the deposition testimony of Committee member Michael Roach. CCRT also relies on several exhibits. These exhibits include: McLean's salary recommendations for 1985; the hierarchial chart used by the committee during its salary determinations; portions of the NTCA's 1984 survey; the Committee's initial salary proposals for 1985; the Committee's notes for the 1985 salary proposals; and the Committee's final salary proposals for 1985.

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093; *see also Reeder–Baker v. Lincoln National Corp.,* 834 F.2d 1373, 1376–77 (7th Cir.1987); *Collins v. State of Illinois,* 830 F.2d 692, 698 (7th Cir.1987).

 The record in this case fails to reveal a shred of direct evidence of discrimination on the basis of gender in the determination of Owens' 1985 wages. Therefore, the EEOC may prevail only by utilizing the *McDonnell Douglas–Burdine* method of indirect proof. Focusing on the first step of this method of proof, CCRT contends that the EEOC cannot establish a prima facie case of sex discrimination because Linda Owens is not "similarly situated" to CCRT's other managers. It argues that Owens is not similarly situated to the other managers because there are no similarities between the areas of responsibility, the necessary qualifications, or the specific job duties of each managerial position. The EEOC, relying on *Washington County v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), contends that it is not necessary to prove that Owens' job was substantially the same as the jobs of the other managers to establish a prima facie case of discrimination.

In *Gunther,* the Supreme Court held that a Title VII sex discrimination claim based on differences in compensation is not barred merely because the jobs subject to comparison are not substantially equal. The Court did not, however, set forth the elements of a prima facie case of sex-based wage discrimination. *Gunther,* 452 U.S. at 166 n. 8, 101 S.Ct. at 2246 n. 8. The

Seventh Circuit has deliberately avoided any discussion of the elements necessary to establish a prima facie case of compensation discrimination. *See Beard v. Whitley County REMC,* 840 F.2d 405, 411 (7th Cir. 1988).[9] Nonetheless, since *Gunther* was decided, several courts have held that Title VII sex-based wage discrimination claims require a showing that the jobs being compared are similar. *See Beard v. Whitley County REMC,* 656 F.Supp. 1461, 1472 (N.D.Ind.1987), aff'd 840 F.2d 405 (7th Cir. 1988) (citing *Craik v. Minnesota State University Bd.,* 731 F.2d 465, 479 (8th Cir. 1984); *Epstein v. Secretary of U.S. Dept. of Treasury,* 739 F.2d 274, 278 (7th Cir. 1984); *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1133–34 (5th Cir.1983); *Beall v. Curtis* 603 F.Supp. 1563, 1581 (M.D.Ga. 1985); *Sparrow v. Piedmont Health Systems Agency, Inc.,* 593 F.Supp. 1107 (M.D. N.C.1984); *Briggs v. City of Madison,* 536 F.Supp. 435 (W.D.Wisc.1982); Annotation, *Wage Differentials as Violative of Those Provisions of Title VII of Civil Rights Act of 1964, as Amended (42 U.S.C. § 2000e, et seq.), Which Prohibit Sex Discrimination in Employment,* 62 A.L.R.Fed. 33 (1983)). In *Beard,* the district court found that the message of the above-cited cases and annotation is "that a plaintiff cannot, under the *McDonnell Doulgas–Burdine* paradigm, establish a prima facie case of wage discrimination under Title VII by comparing himself or herself to another person that is not similarly situated." 656 F.Supp. at 1472. As a consequence, the court held that dissimilar jobs cannot be compared for the purpose of establishing a prima facie case of sex-based wage discrimination. *Id.* The court reasoned that

---

9. In *Beard* the court stated that

> This unsettled issue has been presented to this circuit before. However, in the absence of further guidance from the Supreme Court, we have not addressed squarely the matter because our disposition of the cases before us did not require resolution of the issue. We face the same situation here and therefore decline to pass definitively on this issue. As in [*Jennings v. Tinley Park Community,* 796 F.2d 962, 965 n. 2 (7th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1895, 95 L.Ed.2d 502

(1987)], we shall, for the remainder of this discussion, assume, without holding, "that to establish a prima facie case plaintiffs need only show a difference in treatment between two major groups of employees of different sex...." *See also* [*Boyd v. Madison County Mut. Ins. Co.,* 653 F.2d 1173, 1178 (7th Cir. 1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982) ] (affirming district court's determination that prima facie case existed without formulating standard). 840 F.2d at 411.

Although other factors may enter into the compensation determination, it is the factor of skill, effort, responsibility and working conditions of the wage rate. [Footnote omitted]. By eliminating these factors in their prima facie case as an explanation for a differential in wage rates plaintiffs have eliminated the most common defense to a pay discrimination case brought pursuant to Title VII. [Footnote omitted].

*Id.* (quoting *Briggs,* 536 F.Supp. at 445–46); *see also Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094 (the prima facie case serves an important function in litigation for it eliminates the most common nondiscriminatory reasons for the adverse employment action).

The court concurs with the logic and reasoning of the *Beard* and *Briggs* decisions. "The most obvious and common reason to pay one employee more or less than another is that they are not performing similar jobs." *Beard,* 656 F.Supp. at 1472. Accordingly, the EEOC must show that Linda Owens' job is similar to the jobs to which her job is being compared in order to establish a prima facie case of sex-based wage discrimination.

■ The EEOC is comparing Owens' job as CCRT's Customer Service Manager with the jobs of the other managers of CCRT. It argues that Owens was treated differently from the similarly-situated male managers as hers was the only salary decreased. However, aside from the fact that all of the positions compared are managerial, it is undisputed that there are few, if any, similarities between the position of Customer Service Manager and the positions filed by males. The General Manager is responsible for CCRT's general day-to-day management and operation. All of the managers report to him. The Controller is responsible for CCRT's Data Processing and Accounting Departments. The Plant Manager is responsible for the technical branch of CCRT, the Plant Department. The duties of and necessary qualifications for these positions are consistent with their general responsibilities. On the other hand, the Customer Service Manager is re-

sponsible for supervising the Commercial Office and Warehouse and for CCRT's relationship with its customers. Thus, the responsibilities, duties and experience of the Customer Service Manager are of an entirely different nature than those of the other positions. Consequently, no rational trier of fact could find by a preponderance of the evidence that the EEOC can establish a prima facie case of sex-based wage discrimination.

C. *Second and Third Steps of the McDonnell Douglas–Burdine Paradigm*

Considering that the Seventh Circuit has not set forth the elements necessary to prove a prima facie case of wage discrimination under Title VII, the court shall also address CCRT's contentions concerning its proffered reasons for the determination of Owens' wages for 1985 and the EEOC's inability to show that the proffered reasons are a pretext for discrimination.

1. Articulation of valid, nondiscriminatory reasons for the reduction of Owens' wages for 1985

■ Assuming, arguendo, that the EEOC has established a prima facie case of sex discrimination, the burden shifts to CCRT to show a valid, nondiscriminatory reason for the pay cut Owens received in 1985. Any reason proffered by CCRT is invalid only if the reason itself is violative of Title VII. *See Pollard v. Rea Magnet Wire Co. Inc.,* 824 F.2d 557, 560–61 (7th Cir.1987). Additionally, CCRT is not required to persuade the court that it was actually motivated by the proffered reason. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). CCRT need only clearly set forth, through the introduction of admissible evidence, the reasons for Owens' reduction in wages. *See Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094.

CCRT contends that the determination of Owens' wages resulted from the creation and application of an internal wage structure developed prior to the 1985 wage ad-

justments. It further contends that this structure was based on the hierarchy of job positions and not on the characteristics of individuals or their gender. The evidence supports CCRT's proffered explanation. Consequently, the court finds that CCRT has sufficiently articulated valid, nondiscriminatory reasons for the determination of Owens' 1985 wages.

### 2. Pretext for sex discrimination

■ Once the employer articulates a legitimate, nondiscriminatory reason for its employment action, the plaintiff must then show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination. *Reeder–Baker*, 834 F.2d at 1377. "The plaintiff can meet this burden by demonstrating either that the employer's explanation is unworthy of credence or that it is more likely that a discriminating reason actually accounted for the employer's actions." *Andre v. Bendix Corp.*, 841 F.2d 172, 175 (7th Cir. 1988) (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Reeder–Baker*, 834 F.2d at 1377; *Benzies*, 810 F.2d at 148). This burden merges with the plaintiff's ultimate burden of persuading the court that the defendant has intentionally discriminated against its employee. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Thus, the plaintiff bears the burden of not only persuading the court that the defendant dissembled, but also that the defendant's pretextual reason hides an unlawful one. *Reeder–Baker*, 834 F.2d at 1377; *Friedel v. City of Madison*, 832 F.2d 965, 975 (7th Cir.1987); *Pollard*, 824 F.2d at 559.

The EEOC contends that the reduction of Owens' wages was not based on the new internal wage structure devised in March of 1985 as CCRT has not consistently put forward this structure as its justification for the wage reduction. In support of its contention, the EEOC presents to the court portions of the deposition testimony of Committee member Ivan D. Moon, a letter submitted to the EEOC by CCRT's counsel, and a letter submitted to the EEOC by McLean. It argues that neither the deposition testimony of Moon nor the letters submitted to the EEOC provide that the new internal wage structure was the basis of Owens' salary reduction.

With respect to Moon's deposition testimony, the EEOC is incorrect. During his deposition, Moon testified that the Committee (1) looked at the salary and merit system existing prior to 1985 and found it unworkable as there was no uniformity with regard to the raises employees received, (2) developed an organizational chart, (3) reviewed the chart and the existing levels of pay for employees with the same job titles, (4) attempted to establish guidelines, (5) established a level of base pay and a 49–month progression scale, (6) determined pay by position, not by the individual filling that position, pursuant to the organizational chart, (7) determined that three employees would receive a pay decrease because their current level of pay did not fit into the guidelines the, Committee had developed, (8) reviewed information from the NTCA, and (9) determined that Owens' level of pay was above the pay assigned to her position under the organizational chart. Although Moon may not have thoroughly described the Committee's development of the internal wage structure and the relationship between the wage structure and the determination of Owens' 1985 wages,[10] he has adequately provided that the wage structure was the basis for the determination of Owens' wages.

With respect to the two letters submitted to the EEOC, it is correct to say that neither letter explicitly spells out the details of the wage structure adopted by

---

**10.** During Moon's deposition, counsel for CCRT made the following additional comments for the record with regard to this testimony:

> MR. NEIGHBOURS: The only thing I want to note is you have asked him, in essence, to describe the procedure that [the Committee] went through, and I have been sort of noting that he's been giving you pieces of the procedure as we have gone along. The record doesn't indicate that he has either completed, or that he hasn't completed, that description or procedure.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> ... I just don't want it ever to be argued, at that point, that he's indicated that he's completed his description, or not completed his description.

CCRT. In the first letter, Stuart W. Hyvonen, CCRT's counsel, stated in part that "[i]t is the position of [CCRT] that ... Ms. Owens was denied a pay increase because her job duties have changed to a degree that her then present pay was more than her duties warranted." The letter was written on June 18, 1985, a few days after CCRT received notice of Owens' EEOC claim. A copy of the letter was sent to McLean. In the second letter, dated February 21, 1986, McLean stated, in part, that:

> [Owens' 1985 salary] decrease was made to bring the employee's salary in line with the industry average for similar duties and title. The employee had been receiving additional compensation for acting as the manager during the absence of the previous General Manager. The Controller now fills in during the absence of the General Manager. The average rate of pay, during the time in question for a Customer Service Manager was $24,648.00 that the employee is currently being paid.

Thus, neither of the letters explains how the internal wage structure was the basis for Owens' salary reduction.

The EEOC also provides evidence, through portions of the deposition testimony of Moon and Archie Neese, a member of the Board of Directors, showing that neither the Committee nor the Board discussed whether (1) Owens' salary was as high as it was because she had acted as General Manager when Janssen, the former General Manager, was absent, (2) Owens' salary was above the industry average, and (3) Owens' salary would be cut because her job duties had changed.

Nevertheless, after reviewing all the evidence of record, the court must conclude that the EEOC has not satisfied its burden of showing that CCRT's proffered reason for Owens' salary reduction is a pretext for discrimination. The EEOC has presented absolutely no evidence to dispute the fact that the Committee created the internal wage structure and utilized the structure when determining the level of pay for CCRT's employees. Furthermore, neither

of the letters is inconsistent with CCRT's proffered reason. The salary mentioned in McLean's letter, $24,648.00, is comparable with the average pay rates for Commercial Manager as listed in the NTCA survey (after the $2,000.00 adjustment is made in the NTCA rates). The average pay rates listed in the NTCA survey can clearly be considered average salaries within the industry. McLean's statement in this letter concerning Owens' receipt of additional compensation for serving as Acting General Manager is immaterial. McLean later gave deposition testimony that: (1) when the wage and salary adjustments were made in 1985, an additional sum was given to the Controller for duties he would be assuming in the absence of the General Manager; (2) as a consequence, he assumed that prior to his becoming General Manager, Owens had received additional compensation when she served as acting General Manager; and (3) his assumption was incorrect as he was unable to find any documentation confirming that Owens received any additional compensation. Considering that McLean received a copy of Hyvonen's letter and that McLean was responsible as General Manager for providing information, it is clear that Hyvonen's statement that Owens' received a salary decrease because her duties had changed was based on McLean's false assumption with respect to Owens previously serving as acting General Manager. Both letters refer to the fact that Owens' salary was based on her duties. The evaluation of such duties was a critical element of the internal wage structure. Therefore, neither of the letters, nor any of the other evidence presented could reasonably support the inference that CCRT decreased Owens' salary because of her sex.

### D. Conclusion—Sex Discrimination

Since a reasonable trier of fact could not find by a preponderance of the evidence that a prima facie case of sex discrimination is present, or that CCRT's proffered reason for Owens' salary reduction is a pretext for discrimination, CCRT's motion for summary judgment should be GRANT-

ED as to the EEOC's claim of sex discrimination.

## III. CLAIMS OF RETALIATION UNDER TITLE VII

### A. *Allegations and Standards of Review*

■ The EEOC's second claim is that CCRT has engaged in and is continuing to engage in retaliation against Owens' filing of a charge of sex discrimination with the EEOC. CCRT allegedly retaliated against Owens by (1) holding an employee meeting to intimidate and harass her, (2) reprimanding her for behavior towards customers and directors of CCRT, (3) failing to approve her as CCRT's representative in small claims court, (4) deleting the "dispatch function" from her list of job responsibilities, and (5) denying her a pay raise in 1986. The EEOC seeks, in part, a permanent injunction enjoining CCRT "from engaging in any employment practice which discriminates in retaliation against employees filing Title VII discrimination charges."

Title VII provides, in pertinent part, that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The relative burdens for proving a claim of retaliation parallel those established by the Supreme Court in *McDonnel Douglas* and *Burdine*. *See Collins v. State of Illinois*, 830 F.2d at 702; *Jennings v. Tinley Park Community Consolidated School District No. 146*, 796 F.2d 962, 966 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987). A plaintiff first has the burden of establishing a prima facie case of retaliation. The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. If the defendant carries its burden, the burden then shifts back to the plaintiff to prove

that the defendant's proffered reason is a pretext for an underlying retaliatory reason. *Collins,* 830 F.2d at 702; *Jennings,* 796 F.2d at 966; *Klein v. Trustees of Indiana University,* 766 F.2d 275, 280–81 (7th Cir.1985).

CCRT contends that there are legitimate, non-retaliatory reasons for each of the alleged acts of retaliation. It further contends that the EEOC's claim concerning the reprimand given to Owens is moot.

### B. *Facts*

CCRT has presented the court with evidence of the following facts. In May, 1985, CCRT received notification that Dorothy Klein had filed an unfair labor practice charge against it with the National Labor Relations Board ("NLRB"). CCRT was represented by Rayford T. Blankenship in that charge. At issue was an "employee committee" at CCRT. This committee consisted of several employees elected by other employees to meet and discuss issues of concern with CCRT management. This "employee committee" had been in existence since at least 1979. After the charge was filed, employees made inquiries of McLean as to what was going on, what the charge was about, and what might happen to the Committee.

The NLRB's investigation of Klein's charge against CCRT led it to believe that the employee committee at CCRT was in violation of Section 8(a)(2) of the National Labor Relations Act. Consequently, the NLRB asked that the committee be abolished and that CCRT no longer recognize it. CCRT agreed to settle the case sometime between June 24, and July 2, of 1985. A meeting was scheduled and all employees were asked to attend.

The employee meeting was held. At the beginning of the meeting the employees were informed that the purpose of the meeting was to discuss and address the charge filed with the NLRB and to answer any questions the employees might have. During the meeting, Blankenship talked to the employees to explain the charge, its resolution, and the problems concerning the employee committee. Blankenship also

answered questions from the employees. One employee was especially concerned with the continuing threat of lawsuits against the company. Fearing that future legal fees would deplete CCRT's general money fund and consequently result in the denial of raises and lay-offs, the employee asked Blankenship whether "we [employees] could file suit against the people that are responsible for the lawsuits...." Blankenship answered

> "I think I know what you're dealing with and basically it is the law of torts. To answer your question, in all likelihood if someone brought a frivolous lawsuit against this company then in all likelihood my firm would be a [sic] counter-lawsuit for the collection of fees and costs, and if you or your committee, if you have one, want to intervene, then in all likelihood we would place you as a plaintiff intervenor in the lawsuit. And that gets around properly forming the legal claims, plaintiff v. defendant. That would be the way we would do it. That would be the way I suggest that it be done. The answer to your question is, yes. As a matter of fact, I would hope that you would do that because frivolous lawsuits are a burden on the court, they're a burden on this company, they're a burden on everyone involved emotionally and financially. I don't believe that anyone should bring any frivolous action against any party. I don't care whether its company [sic] or whether its an employee."

Lloyd Ellis, CCRT's President of the Board of Directors, also added

> I'll answer one of the other questions for her. Part of the question. Let me tell you if this continues on not only will there be no raise, they will be some of you looking for a job because we're going to have to lay you off. It's just that simple. If we have enough money in the till, fine. If we don't goodbye. It's not fired, it's laid-off cause we have no recourse.

Later during the meeting the following colloquy took place between Blankenship and one of the employees of CCRT.

MR. BLANKENSHIP: I agree with that. You're next question? Incidentally, will you tell me your name?

EMPLOYEE: Peggy Arnold. This is —I'm getting into areas of kind of assumption, in situations where lawsuits are filed against the company by employees that still work for the company, I understand that it can become kind of sticky, should management personnel wish to make changes or send out directives concerning directly or indirectly affect the people that have filed suit, and it seems like you walk a thin line as to what you can and cannot do because they can take overage of what the decisions or the directives or the changes are claiming retaliation. I would like to know what the line is. Where is it between managerial decisions versus I'm being picked on type of situation.

MR. BLANKENSHIP: I suppose I would direct you to the ajective, [sic] the dictionary [sic] of a paranoid.

EMPLOYEE: Everything, huh, just about?

MR. BLANKENSHIP: No, I don't. I think there's a real—you know your job. You're a good employee. I presume all of you are good employees. You know when you've done something right, but you also know when you've done something wrong. If you did something wrong your're probably going to have to stand to and witness punishment, so to speak. I have to. I guess everybody has somebody that can ring their bell. I don't know if the line—I don't think the line for management will ever be abolished because management is management. You get paid as management and you accept the job as management, and along with the pay and benefits goes the responsibility. And if you don't do your job as management—I'm reminded, several years ago, the first case I ever had was a case called Colorado Interstate Gas Corp. who had a written policy for all their management personnel that they accepted no notice and that they gave none for their management people. And I saw them put that into effect. I saw them perfect that policy when they—be-

cause a production control manager walked in and gave a plant manager a months notice and he said I'll give you 2 months pay if you get out of your office in 10 minutes. That has been the philosophy of management for years, and I don't think it'll ever change. I'm not saying that's necessarily the policy and philosophy of the management of this company. I don't know that much about this company. I have met Mr. McLean. I know him to be a good manager. I met Mr. Ellis. I also know him to be a good manager. A very responsible person. Does that answer your question?

EMPLOYEE: Yeah. I was getting to the point if there is fear of more suits being brought against the company, and if that fear or that trying to avoid more lawsuits, if we have to set back and not have decisions made for directives handed out as to how things are to be done workwise versus we can't do it because it will bring down more suits.

MR. BLANKENSHIP: There is that apprehension on the part of the management of this company. They, right now, indicated to me yesterday and on prior occasions that they are more or less walking on egg shells. It's kind of like damn if you do and double damn if you don't. I indicated to them that the best policy to follow would be business as usual in that they do not make special exceptions for anyone simply out of fear of a lawsuit. And I believe that they will follow that advice. We do not intend to take retaliatory action towards this client for exercising her right, cause that's guaranteed to her under the law. It's guaranteed to every one of you, as a matter of fact. And no one is going to retaliate against you not as long as I can avoid it or can put a stop to it. But, on the other hand, if Miss Klein did something that placed her job in jeopardy here, maliciously and without good intention, without good reason, I'd be the first one to tell Mr. Ellis, Mr. McClean that I think you ought to put her on notice, and if she doesn't correct it then I think you ought to fire her because I don't think that Ms. Klein should have a special ex-

ception made for her simply because she exercised her rights under the law. But on the other hand I don't think this company has any right to retaliate against her or anyone of the rest of you because you elect to use the law. Because that's it. Because the law is there for your use and to protect you. Now, next question.

Finally, near the close of the meeting, another employee asked Blankenship about the status of "the other two lawsuits." He said he was not familiar with two suits. The employee then identified an EEOC filing and a Civil Rights Commission complaint. Blankenship said the two charges were one in the same. The employee asked the status. Blankenship then stated that

Well, as this point in time Mr. Hyvonen [Blankenship's associate] has an appearance in it and basically, that is as far as we have gone. We have told them that when they get ready to move on it to contact United States District Court and we'll contact our client and we'll get on with the charade. I don't know what's going to happen to that. As a matter of fact when the thing came in my office I gave it to Mr. Hyvonen, and I don't even know what it says.

Sometime during the evening of July 2, 1985, Ellis informed McLean and Blankenship that Owens had been rude and discourteous to himself and Mildred Sandy, one of CCRT's customers. Owens had been rude to him sometime in 1983. Dorothy Klein had been present when Owens had been rude to Ellis. Ellis had also heard that Owens had been rude to Archie Neese and Ivan Moon, two of the members of the Board of Directors, and to Melissa Apo, one of her subordinates. Blankenship recommended that Ellis and McLean meet with Owens and put her on notice about her conduct. Ellis agreed with Blankenship as he had heard rumors that Owens' rudeness toward employees was becoming a problem. Ellis "indirectly" directed McLean to reprimand Owens. The decision to reprimand Owens was mainly based upon the information Ellis had received with respect to Miss Apo.

The next morning McLean and Ellis met with Owens. McLean informed her that he had received complaints that she had been rude and discourteous to customers and directors. He told her if that was the case she should be aware of it and not do it again. He also told her if she had not been rude and discourteous not to worry about it but to be on notice someone felt she had been. Neither he or Ellis would provide Owens with the names of the individuals to whom she had been rude. A written record was made of the oral reprimand and placed in Owens' personnel file.

The same day, Klein was reprimanded by McLean for displaying an abusive attitude toward other employees. She was not provided with the facts upon which the reprimand was based.

Under CCRT's personnel policies, any record of a disciplinary action is removed from a personnel file after one year. This written record of the oral counseling was removed from Owens' file in July of 1986 and shredded. Owens has not received any subsequent reprimands.

When CCRT is required to appear in small claims court to pursue collection of accounts under $300, it has one of its employees attend as it representative. The employee prepares the paperwork, appears in court and represents CCRT. Before the employee can appear in court as a representative for CCRT, CCRT must sign an affidavit that the person has been authorized to do so and file it with the court. This authorization is established through means of a resolution of the Board of Directors.

When Owens took the position of Customer Service Manager, she became CCRT's representative in small claims court. As her responsibilities increased, she assigned that responsibility to her subordinate, Elizabeth Hinton. In July of 1985, Hinton was scheduled to be out of state on vacation when several small claims matters were scheduled to be heard. Owens approached McLean and informed him of this and asked that he sign the affidavit allowing Owens to appear as CCRT's representative. In reviewing the affidavit, Mc-Lean observed that he would have to state that the person had been authorized to do so by a resolution of the Board of Directors. McLean then informed Board President Ellis of the situation. Ellis called a special meeting of the Board of Directors for purposes of considering the matter and passing a resolution necessary to authorize a representative in place of Hinton.

Before the special meeting was held, Ellis asked McLean whether there would be any problem with Mary Jones, a service representative under Owens, serving as CCRT's small claims court representative. Jones has never been trained to represent CCRT in those proceedings. Ellis told McLean that he did not think Owens would be approved as the court representative by the Board of Directors because of her pending claim with the EEOC. McLean did not think there would be any problem with Jones as the court representative.

The special meeting was held and the Board of Directors approved Jones as CCRT's court representative. The Board felt it would be "uncomfortable" for Owens to serve as the court representative because she had filed a complaint against the company.

As it turned out, Hinton was able to be in town when the small claims hearings were held. Therefore, it was not necessary for Mary Jones to act as her substitute. Hinton continues to be the representative for CCRT in small claims court. Jones is CCRT's secondary representative, but as of yet, she has not received the necessary training to fulfill this function. As the department head, Owens is responsible for providing Jones with this training.

In August of 1985, Melissa Apo, another of Owens' subordinates, performed CCRT's dispatch function. This function is responsible for receiving trouble reports from customers and then dispatching the appropriate individuals to inspect and correct the trouble. The employees who are subject to being dispatched are installation/repair people, construction people and central office maintenance personnel. These three types of employees are plant craft employees who report to the Plant Manager. Apo

raised the issue of whether she was responsible for reporting to her supervisor, Owens, or to the supervisor of the people she dispatched, Plant Manager, Steve Dunagan. At one time the dispatch function had reported to the Plant Manager. McLean believed that the dispatch function would be more efficient if the function reported to the Plant Manager. He also believed that placing the dispatch under the authority of the Plant Manager would resolve the question of who had authority over Miss Apo. McLean and Dunagan discussed this matter during the last week of August of 1985. On August 27, 1985, McLean decided to assign the dispatch function to the Plant Manager. The next day McLean issued the following memorandum:

> To: Department Heads
> Effective immediately responsibility for operation of the Dispatch area is transferred back to the Plant Department. This re-alignment has been done to place the I & R, Central Office, Construction, and the Group Leader—Dispatch, under the direction of one Department Head instead of two. As a result, because of the direct line of communication, additional operational efficiences are expected.
> The Customer Service Department will continue to provide fill-in personnel for Dispatch during lunch, vacations, etc.

Neither Owens nor Apo ever complained to McLean about the assignment change.

In April of 1986, the Wage and Salary Committee was again Mike Roach and Ivan D. Moon. Following the goal established the previous year, General Manager McLean made one across-the-board wage recommendation for all employees. This was a $.32 an hour increase ($665.60 more a year). He suggested the same increase for Hinton and Owens. Klein, the other employee who had not received a raise in 1985, was no longer employed.

The Committee agreed with the amount of the general across-the-board increase proposed. This made the proposed top plant craft hourly rate $11.42 and the top clerical hourly rate $8.67. The Committee also recommended that the wage spread between rates for salaried jobs and hourly plant craft and hourly clerical rates as established in 1985 continue to be the same. The Committee, however, disagreed with McLean's recommendation for Owens and Hinton and decided to maintain the internal structure and red-circle status as established in 1985. It recommended that the Customer Service Manager compensation structure be retained at $2.50 an hour over the new proposed top clerical rate of $8.67 ($11.17 an hour). However, since the individual in that job, Owens, was already being paid above that rate ($11.85), the Committee recommended no increase and followed the Board's decision in April, 1985 that Owens' rate be red-circled until the top clerical rate reached a level $2.50 below Owens' rate. At no time were Owens' 1985 EEOC charges brought up in the Committee's meetings.

Before making a final recommendation for 1986 wage adjustments to the full Board, Roach once again reviewed information available form the NTCA Guideline book (1985). The Committee's recommendations were then presented to and approved by the full Board of Directors without change on March 13, 1986. Neither Owens nor Hinton received a raise in 1986. Although this evidence may be considered weak, when it is considered in conjunction with the other acts of retaliation, some doubt arises as to the purpose of the meeting. The court therefore believes that the better course would be to proceed to trial on all claims of retaliation. Accordingly, CCRT's Motion for Summary Judgment should be DENIED as to this claim.

### C. *Verbal Reprimand*
#### 1. Mootness

CCRT contends that the EEOC's claim concerning the July 3, 1985, verbal reprimand is moot because the written record of the reprimand was removed from Owens' personnel file pursuant to its policies and procedures.

Ordinarily, the voluntary cessation of putatively illegal conduct will not moot a controversy and prevent its adjudication. *City of Mesquite v. Aladdin's Castle, Inc.*, 455

U.S. 283, 289 n. 10, 102 S.Ct. 1070, 1074 n. 10, 71 L.Ed.2d 152 (1982); *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). The cessation will, however, render a controversy moot if the defendant can persuade the court that there is no reasonable expectation that the putatively illegal conduct will be repeated, and there are no remaining effects of the alleged violation. *Ragsdale v. Turnock,* 841 F.2d 1358, 1365 (7th Cir.1988). The defendant's burden of persuasion at this point is a heavy one. *Id.*

There appear to be no remaining effects of the July 3, 1985, reprimand as CCRT voluntarily removed the record of the reprimand from Owens' personnel file and destroyed it. Nevertheless, the court does not believe that CCRT has satisfied the remaining element of the test for mootness. The fact that Owens has not received any reprimand since July 3, 1985, does not sufficiently persuade the court to believe that there is no reasonable expectation that CCRT would reprimand Owens in retaliation for her filing of an EEOC claim. Accordingly, this particular controversy is not moot.

### 2. Pretext for Retaliation

CCRT contends that there is a legitimate, non-retaliatory reason for the reprimand. Specifically, it contends that McLean was acting on information given to him by his boss, Lloyd Ellis, and on advice given by CCRT's labor consultant, Raymond Blankenship.

Assuming that CCRT's proffered reason is valid, sufficient evidence has been presented to prevent the entry of summary judgment on this claim. The EEOC presents evidence that:

1. Klein filed her claim with the NLRB in May of 1985;

2. Owens filed her claim of sex discrimination with the EEOC on June 6, 1985;

3. Allegedly, Owens was rude to Mildred Sandy during a telephone conversation occurring in October or November of 1983;

4. The topic of the phone conversation was a problem with Sandy's billing;

5. Sandy complained about Owens' behavior shortly after the incident occurred;

6. Owens never discussed a billing problem over the telephone with Sandy;

7. Owens was promoted to the position of Customer Service Manager, in part, because of her patience and courtesy in dealing with others;

8. CCRT's General Manager from February 16, 1979, through December 14, 1984, Harley Janssen, never received any complaint from members of the Board of Directors of CCRT's customers and employees concerning Owens' behavior;

9. Owens never had any type of confrontation with Ellis;

10. Klein never witnessed any incident in which Owens was rude to Ellis or to any other individual;

11. Ellis stated that Archie Nees told him that he could bring 10 or 12 customers that would sign an affidavit stating that Owens had been rude to them;

12. Nees denied ever having made such a statement to Ellis;

13. No letters, notes or written reports have been submitted to CCRT regarding complaints about the Customer Service Department and/or Owens;

14. On July 3, 1985, Dorothy Klein was reprimanded by McLean and Ellis for displaying an abusive attitude toward other employees; and

15. Klein was not provided with the facts upon which the reprimand was based.

A reasonable trier of fact considering this evidence in conjunction with the evidence presented by CCRT could find for the EEOC. The trier of fact could infer that Owens' reprimand was retaliatory because (1) the reprimand occurred close in time to Owens' filing of the sex discrimination charge with the EEOC; (2) Ellis, not McLean, was responsible for the decision to

reprimand Owens; (3) Owens was not rude to either Ellis or Mildred Sandy; (4) Owens' alleged acts of rudeness occurred nearly *two years* before the reprimand; (5) Owens was *not* reprimanded for her behavior towards Melissa Apo—supposedly the main reason she received the reprimand; (6) Owens and Klein, who both had filed charges against CCRT with federal agencies, were reprimanded the same day; (7) Ellis was present at both reprimands; and (8) neither employee received the facts upon which the reprimands were based. Accordingly, CCRT's motion for summary judgment should be denied with respect to this claim.

### D. *Small Claims Court Representative*

CCRT contends that there is a legitimate, non-retaliatory reason for its decision to designate Mary Jones as its representative in small claims court as its Board of Directors felt it imprudent to approve someone as its court representative who had a legal claim against the company. It further contends that Owens' claim is moot as Jones had never had to appear as its court representative.

CCRT's contention that this claim is moot is without merit. Jones is still CCRT's secondary court representative. CCRT has presented no evidence which would persuade the court to believe that there is no reasonable expectation that Jones would ever serve as CCRT's representative in small claims court.

Turning to CCRT's other contention, even if the court assumes that CCRT has articulated a legitimate, non-retaliatory reason for its approval of Jones as its secondary court representative, a reasonable trier of fact could find for the EEOC. Considering that the Board of Directors' decision to authorize Jones as its court representative occurred shortly after Owens had filed her charge of sex discrimination with the EEOC, and received a reprimand, and that the Board's decision was based, at least in part, on Owens' filing of the charge with the EEOC, a trier of fact could reasonably infer that the Board's decision was retaliatory in nature. CCRT's

motion for summary judgment, accordingly, should be denied as to this claim.

### E. *Removal of Responsibilities for "Dispatch Function"*

CCRT contends that the responsibilities for "dispatch function" were removed from Owens and given to the Plant Manager to make the function more efficient and to eliminate the question of the function's having to serve two masters. It has presented sufficient evidence to support this contention. Consequently, it has articulated legitimate, non-retaliatory reasons for the transfer of the dispatch function.

The burden thus shifts to the EEOC to show by a preponderance of the evidence that CCRT's proffered reasons are a pretext for retaliation. The EEOC presents evidence that: (1) on August 19, 1985, Owens filed a second charge (charge No. 053852245) with the EEOC alleging that CCRT was retaliating against her because of her initial charge of sex discrimination; (2) CCRT received notice of this charge on August 28, 1985; (3) the dispatch function had been under Owens' supervision since 1980; and (4) prior to August 28, 1985, McLean had not discussed the realignment of the responsibility for the dispatch function with Owens. Although the evidence is not overwhelming, the court believes that the EEOC has presented enough evidence to create a genuine issue of material fact as to the question of pretext. Considering that CCRT engaged in other acts of retaliation and that McLean failed to discuss the forthcoming transfer of the supervision of the dispatch function with Owens, the function's supervisor for five years, a reasonable trier of fact could infer that responsibility for supervision of the function was transferred to the Plant Manager in retaliation for Owens' filing of charges with the EEOC. Accordingly, CCRT's motion for summary judgment should be denied as to this claim.

### F. *Determination of Owens' 1986 Wages*

CCRT contends that there are legitimate, non-discriminatory reasons for the determi-

nation of Owens' 1986 salary. Specifically, it contends that Owens did not receive a raise in 1986 as the Committee decided to follow the Board of Directors' red-circle status developed for her wages in 1985.

Assuming that CCRT has articulated a legitimate, non-retaliatory reason for Owens' failure to receive a raise in 1986, the court believes that the EEOC has presented sufficient evidence to withstand the entry of summary judgment with respect to this claim. The EEOC presents evidence that after the 1986 wages had been decided, McLean told Owens that he "came this close" (holding his forefinger and thumb together) to getting her a raise but that March 25, 1986, "killed it." March 25, 1986, was the date . EEOC investigators came to CCRT's Cloverdale office and conducted an on-site investigation. A reasonable trier of fact could infer from this evidence that CCRT's proffered reason for Owens' failure to receive a raise is a pretext for retaliation. As a consequence, CCRT's motion for summary judgment should be denied as to this claim.

### G. *Employee Meeting*

Finally, CCRT contends that the employee meeting held on July 2, 1985, was called to inform its employees of the status of the charge filed with the NLRB concerning the "employee committee." It has presented sufficient evidence in support of its proffered explanation to satisfy its burden at the second stage of the *McDonnell Douglas–Burdine* paradigm. The burden, therefore, shifts to the EEOC to show beyond a preponderance of the evidence that CCRT's proffered reason is a pretext for retaliation.

The EEOC argues that the meeting was held, at least in part, to retaliate against Owens for her filing of a claim with the EEOC. In support of its argument it asserts that: (1) Blankenship encouraged employees to counter-sue other employees who file frivolous lawsuits against the company; (2) Blankenship made a statement directing one employee to the "ajective [sic], the dictionary [sic] of a paranoid"; (3) Blankenship described Owens' EEOC claim

as a "charade" and (4) Ellis threatened layoffs if the lawsuits continued. Although this evidence may not be substantial on its own, when it is considered in conjunction with the evidence of the other acts of retaliation, some doubt arises as to the purpose of the meeting. The court therefore believes that the better course would be to proceed to trial on all of the claims of retaliation. Accordingly, CCRT's motion for summary judgment should be DENIED as to this claim.

### IV. CONCLUSION

For the foregoing reason, CCRT's motion for summary judgment is GRANTED as to the EEOC's claim that CCRT discriminated against Linda Owens on the basis of her sex, and DENIED as to the EEOC's claims of retaliation.

### PARTIAL SUMMARY JUDGMENT

This cause comes before the court on the motion of defendant Clay County Rural Telephone, Inc. ("CCRT") for summary judgment, and the court having found that there is no genuine issue of fact to be submitted to a trier of fact on the issue of whether CCRT denied one of its employees, Linda Owens, a raise in 1985 and decreased her salary because of her sex, in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., now concludes that the defendant, CCRT is entitled to partial summary judgment as a matter of law. The court's entry of judgment is based on the undisputed material facts which have been established by the pleadings, portions of depositions with exhibits, and affidavits which have been filed in support and in opposition to the motion for summary judgment. The facts and conclusions of law upon which this partial summary judgment is based are set forth in the entry which is also signed this date, and will not be repeated here.

IT IS HEREBY ORDERED AND ADJUDGED, that there being no just reason for delay, partial summary judgment shall be, and is hereby entered in favor of the defendant, CCRT, on the plaintiff's claim

that CCRT discriminated against Linda Owens on the basis of her sex.

ENTRY

This cause comes before the court on the plaintiff's motion to strike portions of the materials the defendant has submitted in support of its motion for summary judgment.

The court, having read and examined the motion to strike, the memorandum in support of the motion to strike, and the defendant's memorandum opposing the plaintiff's motion, and being duly advised, hereby DENIES the plaintiff's motion to strike.